**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ALAN HARRY, LEVANTE CAPITAL, LLC,
PUBLIC UTILITY DISTRICT NO. 1 OF CLARK
COUNTY, WASHINGTON (D/B/A CLARK
PUBLIC UTILITIES), and C&C TRADING, LLC
on behalf of themselves and all others similarly
situated,

                        Plaintiffs,

          vs.

TOTAL GAS & POWER NORTH AMERICA,
INC., TOTAL, S.A., TOTAL GAS & POWER
LIMITED, and JOHN DOES 1-50,

                    Defendants.

No. 1:15-cv-09689 (JGK)

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT TOTAL GAS & POWER NORTH AMERICA, INC.'S**
**<u>MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

    I.     THE PHYSICAL AND FINANCIAL MARKETS ARE CLOSELY LINKED .... 2

    II.    THE SCHEME............................................................................................... 2

    III.   CFTC AND FERC TAKE ACTION AGAINST TGPNA ................................... 3

    IV.   PLAINTIFFS' CONSULTING EXPERT CONFIRMS HENRY HUB/NYMEX
        ARTIFICIALITY .......................................................................................... 3

LEGAL ARGUMENT .............................................................................................. 4

    I.     PLAINTIFFS' WELL-PLED ALLEGATIONS ESTABLISH ARTICLE III
        STANDING .................................................................................................. 4

    II.    TGPNA'S RULE 12(f) ARGUMENT IS MERITLESS ................................... 6

    III.   PLAINTIFFS' CLAIMS ARE TIMELY ........................................................ 8

    IV.   PLAINTIFFS ADEQUATELY ALLEGE CEA CLAIMS.................................. 9

          A.     Rule 8(a) Governs the Pleading Standards in this Case............................ 9

          B.     Plaintiffs Adequately Allege Actual Damages ........................................ 11

          C.     Plaintiffs Adequately Allege Artificial Price Causation........................... 13

          D.     Plaintiffs Adequately Allege a CEA Manipulation Claim By Reason of
                 TGPNA's Misleading and Inaccurate Reports ........................................ 15

          E.     The CAC Identifies Substantial Evidence Showing Specific Intent to
                 Manipulate Prices.................................................................................. 17

          F.     TGPNA's Intent Arguments Are Unavailing .......................................... 20

          G.     Plaintiffs Properly Plead a Claim for Principal-Agent Liability under the
                 CEA...................................................................................................... 26

          H.     Plaintiffs Properly Plead a Claim for Aiding and Abetting under the CEA
                 ................................................................................................................ 26

    V.    PLAINTIFFS ADEQUATELY ALLEGE CLAIMS FOR UNLAWFUL
        MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION UNDER
        SECTION 2 OF THE SHERMAN ACT ..................................................... 27

A.    Plaintiffs adequately plead antitrust standing ............................................ 27

B.    Plaintiffs adequately allege claims for monopolization and attempted monopolization .................................................................................................. 30

CONCLUSION.................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N.E. Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012)............................................................................................12

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014)..........................................................................................3

*Aguilar v. Immigration & Customs Enforcement Div. of the U.S. Dep't. of
    Homeland Sec.*,
    811 F. Supp. 2d 803 (S.D.N.Y. 2011) (Koeltl, J.) ........................................................4

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    No. 14 Civ. 7126 (JMF), 2016 WL 1241533 (S.D.N.Y. Mar. 28, 2016) .........................11, 29

*Alvin S. Schwartz, M.S., P.A. Employer/Employee Profit Sharing Plan v.
    O'Grady*,
    No. 86 Civ. 4243 (JMC), 1990 WL 156274 (S.D.N.Y. Oct. 12, 1990)...................................9

*In re Amaranth Natural Gas Commodities Litigation ("Amaranth I")*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)..........................................................................20

*In re Amaranth Natural Gas Commodities Litig. ("Amaranth II")*,
    612 F. Supp. 2d 376 (S.D.N.Y. 2009)..........................................................................23

*In re Amaranth Nat. Gas Commodities Litig. ("Amaranth III")*,
    269 F.R.D. 366 (S.D.N.Y. 2010) ................................................................... *passim*

*In re Amaranth Natural Gas Commodities Litig.*,
    730 F.3d 170 (2d Cir. 2013)..........................................................................................27

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)..........................................................................................29

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)...............................................................................................27, 30

*In re Bear Stearns Mortgage Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012)..........................................................................7

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
    369 F.3d 212 (2d Cir. 2004)..........................................................................................27

*Braman v. CME Grp., Inc.*,
No. 14 Civ. 2646, 2015 WL 7776871 (N.D. Ill. Dec. 3, 2015) ..............................................13

*Cargill v. Hardin*,
452 F.2d 1154 (8th Cir. 1971) ....................................................................................................18

*Carter v. HealthPort Techs., LLC*,
No. 15 Civ. 1072, 2016 WL 2640989 (2d Cir. May 10, 2016) ......................................................5

*CFTC v. Amaranth Advisors, L.L.C.*,
554 F. Supp. 2d 523 (S.D.N.Y. 2008)...................................................................................10, 18

*CFTC v. Byrnes*,
58 F. Supp. 3d 319, 324 (S.D.N.Y. 2014) ..................................................................................26

*CFTC v. Kraft Foods Grp., Inc.*,
No. 15 Civ. 2881, 2015 WL 9259885 (N.D. Ill. Dec. 18, 2015) .................................................16

*CFTC v. Parnon Energy Inc.*,
875 F. Supp. 2d 233 (S.D.N.Y. 2012)...................................................................................10, 14

*CFTC v. Wilson*,
27 F. Supp. 3d 517 (S.D.N.Y. 2014)............................................................................................10

*City of Perry, Iowa v. Procter & Gamble Co.*,
No. 15 Civ. 8051 (JMF), 2016 WL 2939511 (S.D.N.Y. May 19, 2016)........................................5

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*
*("Silver Futures I")*, No. 11 MD 2213 (RPP), 2012 WL 6700236
(S.D.N.Y. Dec. 21, 2012)..................................................................................15, 17, 20, 21

*Cresswell v. Prudential-Bache Sec., Inc.*,
No. 83 Civ. 2099 (RWS), 1986 WL 14921 (S.D.N.Y. Dec. 23, 1986) ......................................12

*In re Crude Oil Commodity Futures Litig.*,
913 F. Supp. 2d 41 (S.D.N.Y. 2012)..................................................................................*passim*

*De La Fuente v. DCI Telecomms., Inc.*,
259 F. Supp. 2d 250 (S.D.N.Y. 2003)............................................................................................7

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006).........................................................................................................4

*Drexel Burnham Lambert Inc. v. CFTC*,
850 F.2d 742 (D.C. Cir. 1988)....................................................................................................18

*In re Fannie Mae 2008 Sec. Litig.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012)......................................................................................6, 8

iv

*First Commodity Corp. v. CFTC*,
   676 F.2d 1 (1st Cir. 1982) ................................................................................18

*Gelboim v. Bank of Am. Corp.*,
   No. 13 Civ. 3565, 2016 WL 2956968 (2d Cir. May 23, 2016) ...............................27

*Hershey v. Energy Transfer Partners, L.P.*,
   610 F.3d 239 (5th Cir. 2010) .................................................................... *passim*

*Hollinger v. Titan Capital Corp.*,
   914 F.2d 1564 (9th Cir. 1990) ...........................................................................18

*In re Indiana Farm Bureau Coop. Ass'n*,
   CFTC No. 75-14, 1982 WL 30249 (C.F.T.C. Dec. 17, 1982)................................14

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)...............................................................................23

*Kleinman v. Elan Corp.*,
   706 F.3d 145 (2d Cir. 2013).............................................................................16

*Laydon v. Mizuho Bank, Ltd.*,
   No. 12 Civ. 3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) .........................17

*Ledford v. Rapid-American Corp.*,
   No. 86 Civ. 9116 (JFK), 1988 WL 3428 (S.D.N.Y. Jan. 8, 1988) ........................7

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR I")*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013).............................................................8, 10

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR II")*,
   962 F. Supp. 2d 606 (S.D.N.Y. 2013)................................................................13

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR III")*,
   27 F. Supp. 3d 447 (S.D.N.Y. 2014)....................................................... *passim*

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)..................................................................................8

*Merced Irrigation Dist. v. Barclays Bank PLC*,
   No. 15 Civ. 4878, 2016 WL 861327 (S.D.N.Y. Feb. 29, 2016) ......................28, 35

*Meredith Corp. v. SESAC, LLC*,
   1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ...........................................................34

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) ...........................................................................7

*Myun-Uk Choi v. Tower Research Capital LLC*,
No. 14 Civ. 9912 (KMW), 2016 WL 796849 (S.D.N.Y. Feb. 25, 2016) ..........................9, 10

*In re Natural Gas Commodity Litig.* ("*Natural Gas I*"),
337 F. Supp. 2d 498 (S.D.N.Y. 2004)........................................................................ *passim*

*In re Natural Gas Commodity Litig.* ("*Natural Gas II*"),
358 F. Supp. 2d 336 (S.D.N.Y. 2005).......................................................................7, 10, 25

*In re Natural Gas Commodity Litig.* ("*Natural Gas III*"),
235 F.R.D. 241 (S.D.N.Y. 2006) ...........................................................................14, 28, 29

*New York v. Actavis PLC*,
787 F. 3d 638 (2d Cir. 2015)........................................................................................33, 35

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
562 F. Supp. 2d 392 (E.D.N.Y. 2008) ..................................................................................32

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002).....................................................................................31, 32

*In re Platinum & Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011) ..............................................................................6, 26

*Ploss v. Kraft Foods Grp., Inc.*,
No. 15 Civ. 2937, 2016 U.S. Dist. LEXIS 82755 (N.D. Ill. June 27, 2016) ..............16, 30, 31

*SEC v. Lee*,
720 F. Supp. 2d 305 (S.D.N.Y. 2010)..................................................................................7

*SEC v. US. Envtl., Inc.*,
155 F.3d 107 (2d Cir. 1998)........................................................................................18, 23, 26

*Shak v. JPMorgan Chase & Co.*,
15 Civ. 992 (PAE), 2016 WL 154119 (S.D.N.Y. Jan. 12, 2016) ...........................................34

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016), *as revised* (May 24, 2016)........................................................4, 5

*Strobl v. N.Y. Mercantile Exch.*,
768 F.2d 22 (2d Cir. 1985)...............................................................................................28

*In re Term Cotton Futures Commodities Litig.*,
No. 12 Civ. 5126, 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013)............................................32

*Transnor (Bermuda), Ltd. v. BP N. Am. Petroleum*,
736 F. Supp. 511 (S.D.N.Y. 1990) .......................................................................................12

*United States v. Gilbert*,
  668 F.2d 94 (2d Cir. 1981)..................................................................................7

*Valicenti Advisory Servs., Inc. v. SEC*,
  198 F.3d 62 (2d Cir. 1999)................................................................................18

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
  No. 13 Civ. 6057 (PAC), 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014)...................7

*Verizon Commc'ns. Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)...........................................................................................33

*In re Zinc Antitrust Litig.*,
  No. 14 Civ. 3728, 2016 WL 3167192 (S.D.N.Y. June 6, 2016)............................35

## PRELIMINARY STATEMENT

This lawsuit stems from two government enforcement investigations which uncovered Defendant Total Gas & Power North America, Inc.'s ("TGPNA")[1] prolonged scheme to unlawfully manipulate natural gas prices at certain Regional Hubs (defined below). Although TGPNA seeks to challenge certain allegations, it strikingly does not seriously contest the plausibility of Plaintiffs' allegations that it made manipulative and uneconomic trades at the Regional Hubs and that natural gas prices at those hubs were part of an integrated nationwide natural gas market. Nor does it argue that its trading at the Regional Hubs did not, or could not, impact natural gas futures prices. Rather TGPNA's main argument is that the CAC[2] must be dismissed because, at best, it only shows that TGPNA intended to cause artificial prices at the Regional Hubs. However, under Second Circuit authority, Plaintiffs have more than sufficiently alleged that TGPNA caused artificial prices throughout the natural gas market, injuring Plaintiffs.

---

[1] Plaintiffs have also named Total S.A. ("Total") and Total Gas & Power Ltd. ("TGPL") as defendants in the Consolidated Amended Class Action Complaint, ECF No. 58 ("CAC"), but despite representing those entities before the Commodity Futures Trading Commission ("CFTC") and Federal Energy Regulatory Commission ("FERC"), counsel for TGPNA will not accept service on their behalf, requiring Plaintiffs to engage in the months-long process of serving them through the Hague Service Convention.

[2] All references "¶" or "¶¶" are to the CAC [ECF No. 58]. "Def. Br." refers to Defendant TGPNA's Memorandum of Law in Support of Motion to Dismiss [ECF No. 65]. References to the "Factual Background" and "Legal Argument" Sections are abbreviated "F.B." and "L.A.". All capitalized terms not otherwise defined herein shall have the same meaning as in the CAC.

## FACTUAL BACKGROUND

### I. THE PHYSICAL AND FINANCIAL MARKETS ARE CLOSELY LINKED

As the CAC explains, "[t]he pricing relationships between different U.S. physical natural gas hubs are closely and inextricably linked" such that "changes in basis in one hub are reflected in prices in another hub." ¶4. Prices at natural gas hubs in the U.S. are "closely and inextricably linked" because of "extensive market co-integration." *Id.*; *see also* ¶42. In support of the inextricable linkage among prices at natural gas hubs around the country, the CAC cites several published market studies demonstrating the co-integration of the U.S. natural gas market. *See* ¶42 n.12. That is, to manipulate physical natural gas prices at one hub will have an impact on other hubs, including the Henry Hub. In other words, "to manipulate physical natural gas prices is to necessarily manipulate financial natural gas prices, and *vice versa*." ¶4.

### II. THE SCHEME

For years, TGPNA manipulated natural gas prices at Regional Hubs[3] through hundreds, if not thousands, of illegitimate transactions, transactions which it knew or recklessly disregarded would affect the prices of natural gas at the Henry Hub, the delivery point of many NYMEX and ICE futures contracts. TGPNA's scheme capitalized on the index-price system and the sensitivity of the market during bidweek, i.e., the last five business days of the month, when it would trade significant amounts of physical natural gas contracts at the Regional Hubs, despite having no commercial need or rationale for doing so. ¶¶9, 11. TGPNA's uneconomic trades were intended to control the reported index price, altering the true market price of natural gas. ¶7. In particular, TGPNA "intended to and did, in fact, affect and move the monthly index settlement price in a

---

[3] "Regional Hubs," as defined in the CAC, include:  (1) the El Paso Natural Gas Co.; (2) Permian Basin; (3) El Paso San Juan Basin; (4) Southern California Gas Co.; and (5) West Texas, Waha.

direction that economically benefited [its] financial or 'paper' positions including basis swap, index swap and NYMEX futures positions . . . ." ¶11.

## III.    CFTC AND FERC TAKE ACTION AGAINST TGPNA

On December 7, 2015, the CFTC made public the results of its confidential investigation of TGPNA's manipulative scheme. ¶73. The CFTC concluded that TGPNA manipulated prices on at least four occasions (September 2011, October 2011, March 2012 and April 2012), and TGPNA agreed to pay a $3.6 million penalty. On April 28, 2016, the FERC released the results of its investigation into TGPNA's natural gas market manipulation. ¶88. After a multi-year non-public investigation, FERC concluded that there was "strong" evidence that TGPNA engaged in a much larger manipulation scheme involving 38 or more instances of bidweek manipulation between June 2009 and June 2012. ¶¶76, 83. It issued a 150 page enforcement report and order to show cause as to why TGPNA should not pay a penalty of *$213.6 million*, and why its traders, Aaron Hall and Therese Tran, should not pay $1 million and $2 million in fines each. ¶89.

## IV.    PLAINTIFFS' CONSULTING EXPERT CONFIRMS HENRY HUB/NYMEX ARTIFICIALITY

Plaintiffs' Consulting Expert conducted statistical and other studies to confirm that TGPNA manipulated and caused artificial prices at Regional Hubs, the Henry Hub, and NYMEX and ICE futures contracts. ¶7. This analysis is detailed in the CAC. ¶¶254-297. The study confirmed "evidence of artificial price movements at the relevant hubs as well as in NYMEX futures prices, which are inextricably linked to Henry Hub prices." ¶297. "These overall trends and pricing patterns demonstrate that the manipulation was not limited to the hub prices, and are consistent with Defendants' more wide-spread unlawful manipulation that affected prices for natural gas spot and futures." ¶297. When manipulating Regional Hub prices, TGPNA "contemporaneously manipulated the NYMEX settlement price either by artificially influencing

3

the Henry Hub spot prices or NYMEX natural gas futures ("NG") prices." ¶254.

## LEGAL ARGUMENT

## I. PLAINTIFFS' WELL-PLED ALLEGATIONS ESTABLISH ARTICLE III STANDING

TGPNA's Article III standing argument ignores the allegations of the CAC and the governing legal standards. The three predicates of standing are: (1) Plaintiffs suffered an "injury-in-fact," that is "concrete and particularized" and "actual or imminent" versus "conjectural or hypothetical"; (2) the injury is "fairly traceable" to TGPNA's conduct; and (3) the injury is capable of being "redressed by a favorable decision." *In re Amaranth Nat. Gas Commodities Litig.* ("*Amaranth III*"), 269 F.R.D. 366, 375 (S.D.N.Y. 2010) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). At the pleading stage, Plaintiffs must allege facts demonstrating each element of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016).

For "standing, [the Court] 'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party' (*i.e.,* the class members)." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). Where the facts regarding standing substantially overlap with the elements of plaintiffs' claims, "a decision as to whether the plaintiffs have established their standing . . . by a preponderance of the evidence would be premature" and should await development of the factual record. *Aguilar v. Immigration & Customs Enforcement Div. of the U.S. Dep't. of Homeland Sec.*, 811 F. Supp. 2d 803, 822 (S.D.N.Y. 2011) (Koeltl, J.).

Plaintiffs' factual allegations establish the three elements of standing. First, Plaintiffs have alleged that they suffered a particularized, concrete and actual injury-in-fact. As participants in the physical and financial natural gas market, Plaintiffs transacted at prices made

artificial by TGPNA's unlawful conduct, and thereby incurred financial injury. ¶8; *see also* ¶85 (referring to the FERC's conclusions that TGPNA "harmed other market participants who purchased or sold natural gas at manipulated prices" and "undermined the credibility of natural gas indexes"). This financial injury "affect[ed] [P]laintiff[s] in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. Specific allegations concerning the amount of artificiality are not required at this stage. *See, e.g., City of Perry, Iowa v. Procter & Gamble Co.*, No. 15 Civ. 8051 (JMF), 2016 WL 2939511, at *3 (S.D.N.Y. May 19, 2016) (municipality adequately alleged standing where it alleged defendants caused damage to water system; even though others could have caused damage, "at the motion to dismiss stage" further allegations were not necessary). Any monetary loss suffered by the Plaintiffs satisfies this element; "'[e]ven a small financial loss' suffices." *Carter v. HealthPort Techs., LLC*, No. 15 Civ. 1072, 2016 WL 2640989, at *5 (2d Cir. May 10, 2016) (quoting *Natural Resources Defense Council, Inc. v. United States Food & Drug Administration,* 710 F.3d 71, 85 (2d Cir. 2013)).

Second, Plaintiffs' injury (trading at artificial prices) is "fairly traceable" to TGPNA's manipulation. This requirement "does not create an onerous standard. For example, it is a standard lower than that of proximate causation." *Carter*, 2016 WL 2640989, at *5 (citing *Rothstein v. UBS AG,* 708 F.3d 82, 91-92 (2d Cir. 2013)). Therefore, even assuming TGPNA's manipulation was directed primarily at Regional Hubs, because prices at the hubs are inextricably linked to Henry Hub prices, Plaintiffs have satisfied the requirement to link TGPNA's manipulative conduct to Plaintiffs' injury. *See* Sections F.B. I and IV, *supra*.

Third, the financial injury can be redressed by the Court in the form of damages. TGPNA's standing argument assumes that its manipulation could not have caused artificial prices at Henry Hub. The argument is, at best, a premature, speculative attempt to refute well-

pleaded facts. In *Amaranth*, the court dealt with a similar, premature standing argument. *See Amaranth III*, 269 F.R.D. at 379-80. The defendants there argued that plaintiffs failed to provide "evidence" of injury and therefore could not establish injury-in-fact for purposes of Article III. The court rejected this argument, finding "plaintiffs are not required to prove injury-in-fact at the class certification stage," and that "case law suggests that because plaintiffs' transacted at artificial prices, injury may be presumed." *Id*. Likewise, here, Plaintiffs have plausibly pleaded these elements; they need not prove them now.

## II.   TGPNA'S RULE 12(f) ARGUMENT IS MERITLESS

TGPNA seeks dismissal of Plaintiffs' claims under Rule 12(f), which governs motions to strike pleadings. Def. Br. at 11. TGPNA does not make a motion to strike nor could it satisfy the elements of such a motion: "that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) (internal quotation omitted).

Although Plaintiffs have referred to evidence from CFTC and FERC documents in the CAC, none of these sources run afoul of Rule 12(f). The CAC does not rely on the government's "unadjudicated accusations" (Def. Br. at 11), but rather includes their statements of factual evidence coupled with credible sources of expert analysis of trading patterns. This is an important distinction. When courts have disallowed references to agency proceedings, it was only because the pleading sought to use the mere existence of the government allegations or their bare conclusions to satisfy pleading requirements. *See In re Platinum & Palladium Commodities Litig.,* 828 F. Supp. 2d 588, 593-94 (S.D.N.Y. 2011).

Expansive application of Rule 12(f) to preclude references to government and third-party allegations have been discredited by the majority of decisions in the Southern District.

> It makes little sense to say that information [that a pleading] could unquestionably rely on if it were mentioned in a news clipping or public testimony—is immaterial simply because it is conveyed in an unadjudicated complaint.

*In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768, n.24 (S.D.N.Y. 2012) (criticizing case upon which TGPNA relies);[4] *see also*, *e.g.*, *In re Natural Gas Commodity Litig.* ("*Natural Gas II*"), 358 F. Supp. 2d 336, 341 (S.D.N.Y. 2005) (denying motion to dismiss complaint copied "almost verbatim" from CFTC Settlement Order); *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 13 Civ. 6057 (PAC), 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014) ("[T]here is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims."); *SEC v. Lee*, 720 F. Supp. 2d 305, 340-41 (S.D.N.Y. 2010) ("NYMEX's acknowledgement and reliance on the SEC and CFTC allegations does not demonstrate that it lacks evidentiary support, but rather provides it with the necessary evidentiary support."); *De La Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003) (finding that an SEC complaint may provide more evidentiary support then similar claims based upon media reports).

---

[4] Defendants also rely on *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003), a decision based on an extreme set of facts, and in which the court lambasted the complaint as "so steeped with impertinent and verbose material that the Court is compelled to reinforce Rule 8 with Rule 12(f)." The cases which *Merrill* cites are inapposite because they addressed either (i) evidentiary uses and not pleadings, *see, e.g., United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981), or (ii) the plaintiff's reliance on an agency's conclusions, and not the underlying facts in the agency's materials. *See Ledford v. Rapid-American Corp.*, No. 86 Civ. 9116 (JFK), 1988 WL 3428, at *1-2 (S.D.N.Y. Jan. 8, 1988) (striking allegation that agency found "probable cause . . . that the defendants had engaged in age discrimination").

The Second Circuit allows the pleading of government materials on information and belief in the complaint. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015). TGPNA must already defend against these factual allegations in the FERC proceedings, and it is not prejudiced by also having to do so here. *See Fannie Mae,* 891 F. Supp. 2d at 472 (no prejudice in allowing "new allegations to stand because many of these defendants must defend themselves against such claims in the SEC's enforcement action . . . .").

## III.    PLAINTIFFS' CLAIMS ARE TIMELY

Plaintiffs first had "actual or constructive knowledge" of TGPNA's possible unlawful conduct no earlier than September 22, 2015, the date that FERC's investigation became public. ¶¶299-300. Thus, both Plaintiffs' CEA and antitrust claims are squarely within their respective two and four year statutes of limitations.

CEA claims accrue only when plaintiffs have inquiry notice—i.e., when "circumstances would have suggested to a person of ordinary intelligence the probability that" the instruments they traded had been subject to manipulation. *In re LIBOR-Based Fin. Instruments Antitrust Litig*. ("*LIBOR I*"), 935 F. Supp. 2d 666, 698 (S.D.N.Y. 2013). "'[D]efendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law.'" *Id.* at 700 (quoting *Newman v. Warnaco Grp., Inc*., 335 F.3d 187, 194-95 (2d Cir. 2003)); *see also In re Crude Oil Commodity Futures Litig*. (*Crude Oil*), 913 F. Supp. 2d 41, 58 (S.D.N.Y. 2012).

TGPNA has not met that heavy burden. It asserts that Plaintiffs were on inquiry notice because of publicly available Regional Hub index prices, NYMEX natural gas futures prices and spot price data from Henry Hub, San Juan, SoCal and Permian hubs. Def. Br. at 10. From this alone, however, a person of "ordinary intelligence" would not be able to discover TGPNA's self-concealing manipulative scheme. ¶299. Moreover, the Consulting Expert's analysis of trade data depends heavily upon facts released only in the CFTC Order and FERC Report, such as

TGPNA's pre-bidweek trading, the details of which were not publicly available. ¶¶257-60. Thus, at a minimum, whether Plaintiffs were "placed on inquiry notice [of their] cause of action [based on TGPNA's market manipulation] raises a factual dispute that cannot be summarily resolved." *In re Natural Gas Commodity Litig.* ("*Natural Gas I*"), 337 F. Supp. 2d 498, 514 (S.D.N.Y. 2004); *see also Crude Oil*, 913 F. Supp. 2d at 58-59.

In addition, Defendants fraudulently concealed their manipulation by taking the following affirmative acts: (1) establishing large positions before the opening of bidweek, ¶¶257-59, when their trades would not be reportable to trade publications, ¶¶46-48; (2) publicly denying the possibility of manipulation to *The Wall Street Journal* once the FERC investigation was made public, ¶300; (3) endeavoring to prevent their manipulation from being documented ¶107; and (4) terminating its employee, Matthew Wilson, in retaliation for reporting the manipulation to the CFTC. ¶115. These affirmative acts raise a question of fact as to whether the statute of limitations should be tolled. *See Alvin S. Schwartz, M.S., P.A. Employer/Employee Profit Sharing Plan v. O'Grady*, No. 86 Civ. 4243 (JMC), 1990 WL 156274, at *9 (S.D.N.Y. Oct. 12, 1990).

## IV.    PLAINTIFFS ADEQUATELY ALLEGE CEA CLAIMS

### A.    Rule 8(a) Governs the Pleading Standards in this Case

The "majority of courts in this Circuit" adopt the "the case-by-case approach" to determine whether Rule 8(a) or Rule 9(b) applies to CEA cases. *Myun-Uk Choi v. Tower Research Capital LLC*, No. 14 Civ. 9912 (KMW), 2016 WL 796849, at *2 (S.D.N.Y. Feb. 25, 2016). In general, "if the theory of manipulation alleged in the complaint is based on false or misleading statements or omissions, it sounds in fraud and Rule 9(b) applies" while if the complaint "alleges a scheme based on a manipulative trading strategy or abuse of market power," "Rule 8(a) is more appropriate." *Id.*

TGPNA incorrectly asserts that the "CEA claims sound in fraud." Def. Br. at 7. But then, when it more fully states its position, argues that its scheme was based on manipulative trading and *not* on false or misleading statements or omissions. For example, TGPNA states: "plaintiffs do not say that defendant's reports to NGI or Platts contained false price and/or volume information concerning natural gas transactions," Def. Br. at 25; and "TGPNA accurately reported the amount and price for each natural gas trade" and did not "report fictitious trades." Def. Br. at 25. Because Defendants' manipulative, uneconomic trading created artificial prices, Rule 8(a) governs. *See Myun-Uk Choi*, 2016 WL 796849, at *1-3 (Rule 8(a) applied where defendants' "high-volume above- or below-market bids" created the market's "false impression" and "illusory price and volume information"); *CFTC v. Wilson*, 27 F. Supp. 3d 517 (S.D.N.Y. 2014) (Rule 8(a) applied to market manipulation that involved placing above-market bids and withdrawing them without any intention to consummate an exchange); *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 245 (S.D.N.Y. 2012) (Rule 8(a) applied where manipulation involved "Defendants' abuse of a dominant market position"); *CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 531 (S.D.N.Y. 2008) (Rule 8(a) applied where manipulation involved "the timing of trades intended to change the closing price").

Even if the CEA claims are considered to sound in fraud, the courts "relax Rule 9(b)'s requirements in the context of manipulation claims, as such claims often 'involve facts solely within the defendant's knowledge.'" *LIBOR I*, 935 F. Supp. 2d at 714 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)). *See also Myun-Uk Choi*, 2016 WL 796849, at *3 n.3. ("Even if the allegations were required to meet the Rule 9(b) standard, that standard is typically relaxed in market manipulation cases."); *Natural Gas II*, 358 F. Supp. 2d at 343-44. This is certainly true in this case as Plaintiffs have virtually no access to information

about TGPNA's trading practices.

### B.      Plaintiffs Adequately Allege Actual Damages

TGPNA's interpretation of the CEA's "actual damages" provision attempts to graft a non-existent heightened pleading standard of specificity onto Plaintiffs' manipulation claim. At this early stage, Plaintiffs are not required to plead specific trading positions when they have adequately alleged that they "traded" (i.e., both bought and sold) natural gas futures and other financial products (including swaps and over-the-counter products) during the manipulated bidweeks and at other times. ¶¶18-23. Plaintiffs' allegations concerning their trade positions plausibly establish that they traded natural gas at artificial prices.[5] "[C]ase law suggests that because plaintiffs transacted at artificial prices, injury may be presumed." *Amaranth III*, 269 F.R.D. at 379-80. "At this stage, the appropriate question is whether the alleged manipulation . . . plausibly caused each Plaintiff to suffer some loss under the terms of some derivative at some point during the years the conspiracy allegedly took place." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14 Civ. 7126 (JMF), 2016 WL 1241533, at *4 (S.D.N.Y. Mar. 28, 2016). "Given the sheer volume of transactions identified by Plaintiffs . . . it

_____

[5] For example, Plaintiff Harry is alleged to have made "hundreds of transactions in natural gas futures and financial contracts throughout the Class Period, including but not limited to natural gas futures, options and swaps on NYMEX and ICE during the bidweek periods listed." ¶18. Levante Capital LLC made "multiple transactions in natural gas futures, options, spreads and swaps during all bid weeks during the Class Period." ¶20. Public Utility District No. 1 "made more than one hundred over-the-counter transactions of physical and financial natural gas contracts during . . . numerous bidweeks identified as manipulated by FERC as well as multiple transactions in periods around those bidweeks." ¶21. *See generally* ¶¶18-23.

is not hard to conclude that the answer to that question is yes." *Id. See also Natural Gas I*, 337 F. Supp. at 509 (rejecting need to demonstrate trading loss at pleading stage).

Moreover, the "actual loss" provision of the CEA does not create a heightened pleading requirement; it is simply a limitation on the available remedies for such a claim. *See, e.g., Cresswell v. Prudential-Bache Sec., Inc.*, No. 83 Civ. 2099 (RWS), 1986 WL 14921, at *1 (S.D.N.Y. Dec. 23, 1986) ("actual damages under 7 U.S.C. § 25 are the exclusive remedy for violations of the CEA"); *Transnor (Bermuda), Ltd. v. BP N. Am. Petroleum*, 736 F. Supp. 511, 523 (S.D.N.Y. 1990) ("Congress added that language to prevent the CEA from being used to recover damages not suffered directly on the commodities market. This Court finds that the CEA limits a plaintiff's recovery to damages to assets that are part of a futures market.").

Heightened standards for pleading loss causation do exist for securities law claims, where "general allegations that a plaintiff traded at artificial prices or suffered a net loss would not be sufficient to show 'actual injury.'" *Crude Oil*, 913 F. Supp. 2d at 60-61. However, this requirement does not apply to CEA claims as "loss causation is not a statutory element of proof under the CEA." *Id.* at 60 (citing *Amaranth III*, 269 F.R.D. at 379-80 and *Kohen v. Pacific Investment Management Co. LLC*, 244 F.R.D. 469, 475 (N.D. Ill. 2007) (stating that *Dura* was not controlling in analyzing "actual injury" under the CEA because it was "not a securities fraud case")). "[T]he issue of 'actual damages' [ ] becomes a complex factual inquiry." *Crude Oil*, 913 F. Supp. 2d at 61. TGPNA's reliance on a securities case, *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 40 (2d Cir. 2012), is misplaced.

The other cases that TGPNA relies on involve unique varieties of manipulation inapplicable here. As in *Crude Oil*, the impact of the manipulation here lasted over many days, making the pleading of day-to-day trading positions by Plaintiffs unnecessary. Defendant's

reliance on *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR II*"), 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013), Def. Br. at 12, is misplaced because on reconsideration, the court made clear that at the pleading stage, plaintiffs are not required to plead actual damages arising from specific trades if the harm arose from long-standing manipulation. *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447, 460-61 (S.D.N.Y. 2014). Here, Plaintiffs allege consistent manipulations occurring over the course of at least 38 bidweeks during a three-year period. Moreover, *LIBOR III* is the only instance in which a court has required pleadings of specific trades to establish actual damages for episodic manipulation. Courts in this district have not required this sort of specificity (tantamount to a damages analysis), even at later stages of litigation. *See Amaranth III*, 269 F.R.D. at 379-80 (citation omitted) (noting at class certification stage that "case law suggests that because plaintiffs transacted at artificial prices, injury may be presumed."); *see also Natural Gas I*, 337 F. Supp. 2d at 509 (rejecting need to demonstrate trading loss at pleading stage).

TGPNA also cites *Braman v. CME Grp., Inc.*, No. 14 Civ. 2646, 2015 WL 7776871, at *11 (N.D. Ill. Dec. 3, 2015). The allegation there was "that every contract in every market traded on the CME and CBOT Exchanges" was tainted by manipulation through the Exchanges granting high frequency traders ("HFTs") exclusive privileges. The *Braman* court would not conclude "actual losses" were pleaded without more specificity because, to do so, would mean "every non-HFT trader would be damaged simply by virtue of the fact that HFTs are operating on the exchange." *Id.* at *11. The alleged manipulation in this case is narrower in scope, involving specific acts in the natural gas market, over identified timeframes, by a single manipulator.

### C.    Plaintiffs Adequately Allege Artificial Price Causation

TGPNA argues that, as a matter of law, its manipulation, which was aimed in part at the

Regional Hubs, did not cause artificiality in NYMEX prices or other instruments tied to the Henry Hub. Plaintiffs, however, make a clear allegation—irrefutable for Rule 12(b)(6) purposes—that prices at the various hubs are "closely and inextricably linked" and that price changes at the Regional Hubs necessarily affect Henry Hub prices due to market co-integration. ¶4; *see also* Sections F.B. I and IV, *supra*. Plaintiffs' position is also supported by the relevant academic literature. *See* ¶42.

TGPNA makes the factual assertion that NYMEX is impervious to manipulation by "a handful of trades" at the Regional Hubs, because NYMEX is a "thickly traded market." Def. Br. at 20. NYMEX natural gas futures prices, however, are impacted by the co-integrated regional hub prices, including those at Henry Hub. ¶42 ("price changes in regional hubs impact prices at the Henry Hub"). *Natural Gas* is instructive. There, the court upheld CEA claims that a defendant manipulated NYMEX natural gas contract prices by "churning" in the spot gas regional markets, not the Henry Hub. *Natural Gas I*, 337 F. Supp. 2d at 521-23. In addition, in that case, the court recognized the interrelationship between published regional hub index prices and Henry Hub prices by requiring the publishers of regional hub indices to produce regional hub transactional data because of their effect on Henry Hub prices. *In re Natural Gas Commodity Litig.* ("*Natural Gas III"*), 235 F.R.D. 241, 244 (S.D.N.Y. 2006). *See also Parnon Energy Inc.*, 875 F. Supp. 2d at 248 ("[I]t is enough, for purposes of a finding of manipulation . . . that [defendant's] action contributed to the price [movement].") (quotation omitted); *In re Indiana Farm Bureau Coop. Ass'n*, CFTC No. 75-14, 1982 WL 30249, at *35 n. 2 (C.F.T.C. Dec. 17, 1982) ("[W]hen a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial.").

TGPNA's reliance on *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239 (5th Cir.

2010), is unavailing. There, the court recognized the *Natural Gas* court's causation holding that spot trades at various hubs can influence NYMEX prices. However, it held that the *Hershey* plaintiffs did not adequately allege that defendants had the requisite scienter with respect to Henry Hub and NYMEX futures prices. *Id* at 249. Here, as discussed below, Plaintiffs allege that TGPNA had the requisite scienter with respect to Henry Hub and NYMEX futures prices.

Plaintiffs do in fact allege that TGPNA traded the Henry Hub and NYMEX prices directly. *See, e.g.,* ¶¶254, 261, 264, 265, 271, 272, 288, 297. The CAC presents graphs depicting the changes in spread positions between the Regional Hub prices and NYMEX and Henry Hub prices during bidweek manipulations. *Id*. The expert work graphically demonstrates TGPNA's manipulations' "consequent impact on Henry Hub and futures prices based on Henry Hub." ¶42. It is this expert price analysis and academic authority *combined* with evidence provided by the CFTC and FERC investigations which demonstrate causation – i.e., the direct impact of the manipulation at the Regional Hubs on futures prices. Thus, contrary to TGPNA's arguments (Def. Br. 17-18), "the evidence … further corroborates the price effects of TGPNA's manipulative trades both at the hubs as well as at NYMEX." ¶265. Plaintiffs clearly allege that prices in the Regional Hubs and futures prices moved in the same direction. E.g., ¶275. Plaintiffs' claims go far beyond the realm of "innuendo" suggested by TGPNA when citing *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *6-7 (S.D.N.Y. June 28, 2007), and *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* ("*Silver Futures I*"), No. 11 MD 2213 (RPP), 2012 WL 6700236, at *16 (S.D.N.Y. Dec. 21, 2012).

### D.    Plaintiffs Adequately Allege a CEA Manipulation Claim By Reason of TGPNA's Misleading and Inaccurate Reports

TGPNA claims that Plaintiffs do not allege a claim under CEA Section 6(c)(1) because

they did not report fictitious trades. However, this covers situations like the instant case where TGPNA knew that the NGI and Platts reports at issue purported to give an accurate picture of the natural gas market prices at a point in time and it deliberately made uneconomic trades to influence that market for their own trading benefit. *See, e.*g., ¶¶5-6, 45-46. 141-190.

TGPNA contends it cannot be held liable for manipulation under CEA 6(c)(1) because it accurately reported its trades and was under no obligation to tell NGI and Platts that its trades were uneconomic and designed specifically to manipulate the NGI and Platts reports. Def. Br. at 25-26. But TGPNA knew that NGI and Platts assumed that the trades TGPNA reported to them were economically justifiable. Instead, TGPNA submitted uneconomic, illegal trades to NGI and Platts without disclosing the fact that they were uneconomic and solely intended to alter the market picture presented by NGI and Platts in their published regional price indices.[6] This adequately states a claim under CEA §6(c)(1). *See CFTC v. Kraft Foods Grp., Inc*., No. 15 Civ. 2881, 2015 WL 9259885, at *11 (N.D. Ill. Dec. 18, 2015) ("Because the Complaint adequately alleges that Kraft fraudulently took its futures position to signal intent to take delivery of the December 2011 wheat from its futures contracts, and that the market was misled by that signal, which ultimately resulted in the prices at issue being based not upon market forces, but rather upon false signals, the Court finds that Plaintiff has adequately pled manipulative conduct."); *accord Ploss v. Kraft Foods Grp., Inc*., No. 15 Civ. 2937, 2016 U.S. Dist. LEXIS 82755, at *40-43 (N.D. Ill. June 27, 2016) (same; denying motion to dismiss §6(c)(1) claim in class action). *See also Kleinman v. Elan Corp*., 706 F.3d 145, 153 (2d Cir. 2013) ("With regard to the statements

---

[6] As discussed below, Plaintiffs allege that TGPNA possessed the requisite intent (recklessness pursuant to Rule 180.1(a)(4) ("knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate")). *See also* ¶¶147-190.

that are actually made, veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers. Statements of literal truth can become, through their context and manner of presentation, devices which mislead investors. Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation.") (internal citations omitted).[7]

### E.   The CAC Identifies Substantial Evidence Showing Specific Intent to Manipulate Prices

"To plead the specific intent element of a claim for manipulation under Rule 8(a), a plaintiff must allege that a defendant 'acted (or failed to act) with the purpose or conscious object of causing or affecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand.'" *Silver Futures I*, 2012 WL 6700236, at *10 (quoting *Parnon Energy,* 875 F. Supp. 2d at 249 (modifications omitted)). Under Rule 9(b), scienter may be shown "either (a) by alleging facts to show that Defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Laydon v. Mizuho Bank, Ltd*., No. 12 Civ. 3419, 2014 WL 1280464, at *5 (S.D.N.Y. Mar. 28, 2014) (internal citations omitted). The scienter element "may be alleged generally." Fed. R. Civ. P. 9(b).

---

[7] TGPNA's "duty to disclose" assertions are irrelevant. Plaintiffs are not claiming that TGPNA possessed a duty to disclose to Platts and NGI. Instead, they are claiming that their deliberate reporting of uneconomic trades to influence the Platts and NGI published indices and deliberate timing of those trades to influence the Platts and NGI reports were intended to, and did, create a misleading impression in the market.

Under either Rule 8(a) or Rule 9(b), Plaintiffs need only plead circumstantial evidence of manipulation; direct proof is not required. *See, e.g.*, *Amaranth Advisors, LLC*, 554 F. Supp. 2d at 532 ("Because 'proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused'") (quoting *In re Indiana Farm Bureau*, 1982 WL 30249, at *6); *Valicenti Advisory Servs., Inc. v. SEC*, 198 F.3d 62, 65 (2d Cir. 1999) (holding proof of scienter under securities laws need not be direct but may be inferred from circumstantial evidence).

Under either pleading standard, such evidence, whether direct or circumstantial, need not show actual knowledge of manipulation; recklessness, defined as an act or omission that "departs so far from the standards of ordinary care that is very difficult to believe the actor was not aware of what he or she was doing," *Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988), is sufficient. *See also First Commodity Corp. v. CFTC*, 676 F.2d 1, 7 (1st Cir. 1982). This recklessness standard requires neither a showing of actual knowledge, *see Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569-70 (9th Cir. 1990), nor proof that the defendant's motive was to interfere in a given market, *SEC v. US. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998). As an example, "[e]ven if [a trader] were motivated by a desire to obtain compensation rather than by a desire" to affect a market price, if the trader recklessly "effected the manipulative trades," he will be held liable. *Id.* at 112. *See also Cargill v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971) (uneconomic act is not necessary condition for a manipulation, but is a sufficient one).

Here, Plaintiffs have alleged direct and circumstantial evidence of intent, almost too voluminous to fully set forth. For example, Plaintiffs have alleged that former TGPNA employee Wilson **admitted to FERC** that he traded fixed price gas, under the direction and supervision of

Tran, for the express purpose of manipulating natural gas prices, and that he was praised and rewarded for doing so. *See generally* ¶¶98-112. In executing the strategy, Wilson "wasn't concerned with whether [he] made or lost money on the fixed price trades," and was only "concerned with having an impact on the first-of-the-month index." ¶109. Indeed, Wilson also explained that TGPNA **deliberately avoided** making otherwise economical physical trades to avoid "negatively impact[ing] the index as far as [Defendants'] financial position was concerned." ¶103. After Wilson blew the whistle internally, TGPNA fired him. ¶¶113-115. Wilson's admitted participation in the manipulation is **direct evidence** of **actual knowledge**, the strongest form of scienter proof possible, and these allegations alone are sufficient to plead intent under any standard. Notably, TGPNA's brief *fails to discuss the Wilson-related allegations at all*, much less challenge them.

Moreover, Wilson's admissions are just the tip of the iceberg. Plaintiffs also allege that TGPNA's trading, which "often accounted for 50% of the total market by volume," ¶147, *see also* ¶193 ("West Desk [trading] was routinely more than half of the trades by volume on the index"), occurred at locations where they had "no material commercial need, customer business, physical assets, or transportation," ¶9, *see also* ¶¶11, 25, 140, 147, 253, such that they *had no reason or ability to take or make delivery of physical gas at those locations*. In challenging the CAC's scienter allegations, TGPNA entirely ignores these facts and fails to offer any plausible non-manipulative explanation for them. *See* Def. Br. at 20-25 (no mention of these allegations).

There is even more. For instance, the CAC alleges that TGPNA used a meticulously constructed spreadsheet specifically designed for bidweek trading that monitored in real time the manipulative impact their trades were expected to have on the index, and therefore on their profits and losses. ¶¶178-188. Indeed, the spreadsheet even allowed the West Desk to calculate

*precisely how much fixed price trading was needed to move the index by a desired amount*. ¶187. The CAC further alleges that Hall successfully pushed for the creation of a trade accounting system that combined financial and physical positions, allowing for easier administration of the scheme. ¶189. The CAC also alleges that red flags concerning manipulative bidweek activity were known throughout TGPNA, not just at the West Desk. ¶¶156-177.

Taken together, there is simply no non-manipulative, non-culpable explanation for this trading activity, and TGPNA tellingly does not attempt to offer one. Simply put, there can be no doubt that the "the facts alleged [in the CAC], taken as true, give rise to a strong inference that manipulation was the dominant purpose of the transaction[s]." *In re Amaranth Natural Gas Commodities Litigation* ("*Amaranth I"*), 587 F. Supp. 2d 513, 536 (S.D.N.Y. 2008).

### F.    TGPNA's Intent Arguments Are Unavailing

TGPNA argues that the CAC does not adequately allege that "TGPNA specifically intended to manipulate the prices of natural gas at even the Regional Hubs" primarily because the CAC "does not include any reference to specific communications by TGPNA about any specific plan to cause artificial prices." Def. Br. at 21 (citing *Silver Futures I*, 2012 WL 6700236, at *11). For several reasons, this argument fails.

First, TGPNA's attempt to explain away the exchange between Hall and Tran described in the CAC at ¶195 as "law-abiding traders" making sure they "understood their positions going into bid week" is stunningly facetious. What Hall *actually* said to Tran was that she could take personal time "as long as you have bidweek stuff ready," "*i.e.* **you've bought all the socal index you can**." ¶195 (emphasis added). Why "law-abiding traders" need to buy **all** the fixed price physical gas at a single location, or why doing so is necessary to be prepared for bidweek, if not to manipulate prices, is unexplained. Second, TGPNA fails to grapple at all with Wilson's explanation that the bidweek scheme was "a very sensitive subject" that TGPNA avoided

discussing openly, to the point that employees were admonished not to "put anything questionable in IMs [instant messages] . . . [or] e-mails." ¶107.

More fundamentally, however, there simply is no requirement that specific contemporaneous communications about the alleged manipulation are required to avoid dismissal, and *Silver Futures I* does not hold otherwise. There, the court merely noted that *one* method by which intent had been adequately pleaded in other cases was by alleging the *existence* of communications regarding a plan to manipulate prices. *See Silver Futures I*, 2012 WL 6700236 at *11. It then noted that the complaint it was considering contained "no reference to specific communications." *Id.* However, *Silver Futures I* does not create a legal requirement that a complaint must allege specific, contemporaneous communications—or any communications at all—about the manipulative scheme to survive dismissal.

TGPNA's remaining arguments about scienter as it relates to the Regional Hubs are similarly meritless. TGPNA attacks the analysis of the Consulting Expert as insufficient to adequately plead intent. But Plaintiffs do not rely solely, or even primarily, on that analysis to plead intent. TGPNA also faults Plaintiffs for conclusory allegations that TGPNA's trades were uneconomic or money-losing, and for failing to "allege facts, not conclusions." Def. Br. at 22. However, Plaintiffs have alleged a mountain of facts showing that TGPNA's fixed price physical gas trading lacked legitimate economic purposes. *See* Sections F.B. II-IV, *supra*.

TGPNA's final argument is that to allege manipulation of NYMEX natural gas futures, Plaintiffs must plead scienter with respect to prices at Henry Hub specifically, as opposed to prices in the natural gas market generally, or prices at the Regional Hubs. In support, TGPNA relies exclusively on *Hershey*, 610 F.3d at 247. There, the Fifth Circuit held that the "commodity underlying" NYMEX natural gas futures contracts was strictly limited to gas delivered at Henry

Hub, such that plaintiffs were required to plead scienter as to Henry Hub in particular. Plaintiffs respectfully submit that, on this point, the *Hershey* decision was decided incorrectly, and that the "commodity underlying" natural gas futures contracts is natural gas generally.

However, even if this Court follows *Hershey*, Defendant's argument fails as it rests on the false premise that "the Complaint does not even try to allege an intent to affect Henry Hub pricing or NYMEX instruments." Def. Br. at 24. To the contrary, the CAC is replete with allegations that Defendant's manipulation at the Regional Hubs was at least reckless in creating artificial prices at Henry Hub. *See, e.g.*, ¶¶3, 4, 7, 42, 251, 254, 297, 298. Indeed, the CAC alleges that "[a]t minimum, Defendants acted recklessly or with reckless disregard for the potential impact of their trading on natural gas prices and the integrity of the natural gas market," ¶251, and that Defendant's "manipulation was not only directed at the relevant hubs, but also at the Henry Hub." *Id.* Thus, contrary to Defendant's argument, Plaintiffs *have* alleged facts in support of Defendant's intent to affect Henry Hub prices.

Third, TGPNA's argument is that, because its manipulative scheme ostensibly did not depend on Henry Hub manipulation, *see, e.g.*, Def. Br. at 24, Plaintiffs cannot satisfy the intent requirement. This argument is plainly wrong because it conflates *motive* with *intent* (*i.e.*, scienter), which are two distinct legal concepts. The former refers to the *motivation* that prompts one to act (or fail to act), while the latter refers merely to one's *state of mind* when the act is performed (or omitted).

Here, even assuming Plaintiffs must establish scienter as to Henry Hub prices specifically, Second Circuit precedent only requires that Plaintiffs allege that when Defendants intentionally manipulated Regional Hub prices, they were at least reckless (*i.e.*, possessed the requisite *scienter*) with regard to the manipulative and artificial effect their Regional Hub

manipulation would have on prices at Henry Hub. Significantly, Plaintiffs are ***not*** required to allege that TGPNA was *motivated* to create artificial prices at Henry Hub itself. *See, e.g.*, *US. Envtl*, 155 F.3d at 112 (finding scienter established for manipulation claim "[e]ven if [a trader] were motivated by a desire to obtain compensation rather than by a desire" to create artificial prices, "if, with scienter, he effected the manipulative trades."). Put simply, whether TGPNA *wanted* to create artificial prices at Henry Hub is not determinative of whether it possessed the requisite *intent* or *scienter*.

Indeed, under Second Circuit precedent, "[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). "To plead scienter based on conscious misbehavior or recklessness, 'plaintiffs must allege facts supporting an inference that defendants deliberately or recklessly engaged in illegal conduct or conduct that is highly unreasonable and an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *LIBOR III*, 27 F. Supp. 3d at 469 (quoting *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) and citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)) (modifications and internal quotation marks omitted). "Thus, an express allegation of deliberate misconduct can be sufficient to plead scienter." *In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth II*"), 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009).

In *LIBOR III*, the court considered whether plaintiffs had adequately pleaded intent in connection with claims that defendants manipulated Eurodollar futures prices by submitting artificial LIBOR quotes to the British Banking Association ("BBA"). The court first considered

the argument that intent was indicated by, among other things, defendants' motive to profit from trading in Eurodollar futures. After rejecting that argument as implausible, the court turned to the question of "whether plaintiffs have adequately pled scienter through the [defendants'] conscious misbehavior or recklessness." *Id.* at 469. The court noted that plaintiffs had "more than adequately pled that defendants 'consciously misbehaved' by submitting artificial LIBOR quotes to the BBA." *Id.* at 470. The court then stated that "plaintiffs have also pled that the 'danger' of submitting artificial LIBOR quotes—the manipulation of Eurodollar futures contracts—was either known to the defendant banks or so obvious that they must have been aware of it." *Id.* As a result, the court found that "it is plausible that all defendants, regardless of their positions in the market, manipulated LIBOR for reputational purposes while ***knowing*** that such conduct would impact the price of Eurodollar futures." *Id.* (emphasis in original). Therefore, the court found "that plaintiffs have adequately pled scienter based on a conscious misbehavior or recklessness theory." *Id.*

The *LIBOR III* defendants objected that "knowledge is not enough," and the court agreed that "'only intent, not knowledge, can transform a ***legitimate transaction*** into manipulation.'" *Id.* (quoting *Amaranth I*, 587 F. Supp. 2d at 539) (emphasis in *LIBOR*). The court explained that, where "potentially legitimate" transactions are concerned, "a plaintiff should have a greater burden in demonstrating that the conduct was actually manipulative," such that it "makes sense" to require more than "knowledge of an effect" to establish scienter. *Id.* However, the court noted, "this case does not concern defendants' legitimate transactions;" "[b]ecause the conduct alleged has no legitimate purpose, plaintiffs need not demonstrate that defendants acted with bad intent to distinguish the complained of conduct from potentially lawful activity. Rather it may suffice for plaintiffs to allege that defendants knowingly engaged in unquestionably illegitimate conduct

while fully comprehending the consequences in the market." *Id.* (citing *Natural Gas II*, 358 F. Supp. 2d at 344-45 (finding that allegations that defendants knowingly delivered false reports to index trade publications were sufficient to state a CEA claim)).

As in *LIBOR III*, Plaintiffs here have "more than adequately pled that defendants consciously misbehaved." Specifically, TGPNA engaged in a multi-year campaign to manipulate natural gas prices at Regional Hubs. In addition, like *LIBOR III*, Plaintiffs have pleaded the "danger" of that misbehavior—artificial prices at Henry Hub—"was either known to the [Defendants] or so obvious that the defendant must have been aware of it." *LIBOR III*, 27 F. Supp. 3d at 469. Specifically, the CAC contains numerous facts showing the Regional Hubs and Henry Hub are part of a single, integrated natural gas market, such that it is essentially impossible to manipulate prices at the Regional Hubs without at least affecting prices at Henry Hub, and that these facts were well-known to sophisticated market participants such as Defendants. And finally, as in *LIBOR III*, any argument by TGPNA that such knowledge is insufficient to establish scienter should be rejected, because "the conduct alleged [here] has no legitimate purpose," such that "[P]laintiffs need not demonstrate that [D]efendants acted with bad intent to distinguish the complained of conduct from potentially lawful activity." Accordingly, Plaintiffs have adequately pleaded scienter for manipulation at Henry Hub.[8]

---

[8] *Hershey* is inapposite here because it did not address the interplay between the "conscious misbehavior or recklessness" standard for scienter and its holding that the "underlying commodity" for NYMEX natural gas futures is strictly limited to natural gas for delivery at Henry Hub. And to the extent *Hershey* requires that scienter is never satisfied in a case alleging harm as a result of artificial NYMEX prices unless plaintiffs allege defendants' *motive* was to directly alter NYMEX or Henry Hub prices, it is inconsistent with Second Circuit law, which

### G. Plaintiffs Properly Plead a Claim for Principal-Agent Liability under the CEA

A principal-agent relationship under the CEA exists when the agent acts on the principal's behalf, even when the principal did not control or participate in the agent's wrongful behavior. *Platinum*, 828 F. Supp. 2d at 599. In the CEA context, principals are strictly liable for the acts of their agents within the scope of employment, *CFTC v. Byrnes*, 58 F. Supp. 3d 319, 324 (S.D.N.Y. 2014), and under Second Circuit law an agent is deemed to act in the scope of his employment when the agent's acts benefit the principal to at least some degree. *Id*. at 327.

Hall and Tran were acting on TGPNA's behalf in executing manipulative trades and agents of TGPNA regardless of the degree of control or participation of TGPNA's management in their trading. ¶332. TGPNA is strictly liable for their acts because Hall and Tran acted in the scope of their employment and their conduct benefitted TGPNA.

### H. Plaintiffs Properly Plead a Claim for Aiding and Abetting under the CEA

Plaintiffs' aiding and abetting claims are primarily directed at Total and TGPL, affiliates of TGPNA who have not yet appeared in this case. As for Defendant TGPNA, Plaintiffs have alleged that (1) TGPNA monitored and supervised its traders' activities, ¶¶150, 153, 154, 166,

---

does *not* require motive for intent. *See Hershey*, 610 F.3d at 249 ("Plaintiffs here cannot tie Defendants' manipulation of the HSC price index to an intent or ***motive*** to manipulate the Henry Hub price and thus summary judgment was not premature.") (emphasis added); *cf. U.S. Envtl., Inc.*, 155 F.3d at 112 (a manipulation defendant's "motivation for manipulating the market is ***irrelevant***" where scienter [e.g. recklessness] is established) (emphasis added); *cf. also LIBOR III*, 27 F. Supp. 3d at 469 (holding that, "[w]here motive is not apparent," CEA's specific intent standard could be met by pleading "conscious misbehavior or recklessness.")

(2) TGPNA provided its traders with the authority, the investment funds, and the technology that enabled their manipulative activities, ¶¶26, 83, 130, 138, (3) TGPNA benefited economically from its traders' manipulative activities, ¶¶85, 245, 253, 337-40, and (4) when TGPNA's traders engaged in market manipulation, it was with TGPNA's management's knowledge, ¶¶87, 115, 150, 253, and they were in a position to stop those activities at any time and failed to do so, ¶¶245-6, 252. Thus, TGPNA is liable for aiding and abetting its traders' manipulations. *See In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 182-83 (2d Cir. 2013).

## V.   PLAINTIFFS ADEQUATELY ALLEGE CLAIMS FOR UNLAWFUL MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION UNDER SECTION 2 OF THE SHERMAN ACT

### A.   Plaintiffs adequately plead antitrust standing

To have standing to bring a claim for monopolization, Plaintiffs must allege antitrust injury, i.e., injury "of the type the antitrust laws were intended to prevent . . . flow[ing] from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). To establish antitrust injury, "a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004). "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Gelboim v. Bank of Am. Corp.*, No. 13 Civ. 3565, 2016 WL 2956968, at *8 (2d Cir. May 23, 2016) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Here, the CAC adequately pleads antitrust injury. *See also* Section L.A. I, *supra* (explaining why Plaintiffs adequately pleaded Article III "injury-in-fact"). TGPNA manipulated prices in the physical natural gas market at the Regional Hubs by engaging in "uneconomic

trades that were . . . specifically intended to skew and make artificial the price of natural gas as well as the inextricably linked prices of natural gas futures, options and swaps traded on NYMEX and [ICE]." ¶7; *see also id.* at ¶78. It controlled the published index prices of natural gas at the Regional Hubs, thereby causing Henry Hub price artificiality. ¶7. *See Natural Gas III*, 235 F.R.D. at 246-48.

Plaintiffs transacted at prices made artificial by TGPNA's unlawful conduct, and thereby incurred financial injury. *Id.* at ¶8; *see also id.* at ¶85 (referring to the FERC's conclusions that TGPNA "harmed other market participants who purchased or sold natural gas at manipulated prices" and "undermined the credibility of natural gas indexes"). Plaintiffs' injuries are quintessential antitrust injuries. *See, e.g.*, *Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 28 (2d Cir. 1985) ("[P]rice manipulation is an evil that is always forbidden under every circumstance by both the Commodity Exchange Act *and the antitrust laws*.") (emphasis added); *Merced Irrigation Dist. v. Barclays Bank PLC*, No. 15 Civ. 4878, 2016 WL 861327, at *5 (S.D.N.Y. Feb. 29, 2016) (plaintiff adequately pled facts showing antitrust injury by alleging it transacted in physical and financial instruments that settled against the index price that defendant allegedly manipulated); *Crude Oil*, 913 F. Supp. 2d at 57 (antitrust standing found because plaintiffs, purchasers of financial futures and related products whose prices were based on the price of physical crude oil, suffered antitrust injury by "transacting in a market tainted by price manipulation").

TGPNA argues that Plaintiffs do not allege antitrust injury in the physical market because they do not identify their specific positions or trades. Def. Br. at 28. Plaintiffs alleged that they traded physical and financial contracts at artificial prices during the 38 bidweeks presently identified as having been manipulated by TGPNA. *See* ¶¶18-23; *see also* ¶21 (alleging Plaintiff

Clark PUD traded in the physical market); ¶302 (defining the class to include those who traded in the physical and financial natural gas market). At the pleading stage, Plaintiffs are not required to identify with greater specificity each and every physical and financial contract they held during the Class Period. *See, e.g.*, *Alaska Elec.* 2016 WL 1241533, at *4 ("At this stage, the appropriate question is whether the alleged manipulation of ISDAfix plausibly caused each Plaintiff to suffer *some* loss under the terms of *some* derivative at *some* point during the years the conspiracy allegedly took place. . . . Given the sheer volume of transactions identified by Plaintiffs . . ., it is not hard to conclude that the answer to that question is yes.") (emphasis in original); *Crude Oil*, 913 F. Supp. 2d at 48 (denying motion to dismiss complaint brought by "individuals and corporate entities that traded NYMEX WTI futures contracts and calendar spreads"); *Natural Gas I*, 377 F. Supp. 2d at 500 (denying motion to dismiss complaint brought by purchasers and sellers of natural gas futures and option contracts traded on the NYMEX).

TGPNA further contends that the CAC fails to plead antitrust injury because, with respect to Plaintiff Clark PUD, it "does not allege that it participated at any of the four regional markets" and "[i]t is not enough for plaintiffs to assert that markets were intertwined." Def. Br. at 28. However, the CAC sufficiently alleges that physical prices at the Regional Hubs and the Henry Hub are intertwined. *See* Sections F.B. I and IV, *supra*. The "pricing relationships between different U.S. physical natural gas hubs are closely and inextricably linked" such that pricing at one hub affects pricing at another. ¶¶3-4, 265. These allegations are accepted as true. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). *See also Natural Gas III*, 235 F.R.D. at 246-48. As with the other Plaintiffs, Clark PUD has alleged antitrust injury.

TGPNA also unconvincingly argues that Plaintiffs "do not allege a link between their alleged injury and [TGPNA's] conduct" because "[P]laintiffs have not plausibly alleged that

such price differences were the result of a reduction in competition." Def. Br. at 29. But the CAC plainly states that "the prices of natural gas derivative financial contracts . . . are inextricably linked to the prices of physical natural gas contacts," meaning "to manipulate physical natural gas prices is to necessarily manipulate financial natural gas prices, and *vice versa*." ¶4; *see also* Sections F.B. I and IV, *supra* (explaining linkage between natural gas physical and financial market and collecting cases). Plaintiffs allege: (1) losses in the natural gas derivatives market; (2) caused by artificial market prices; (3) that were created by TGPNA's unlawful manipulation of physical natural gas prices through excessive and intentional uneconomic transactions during bidweek at the Regional Hubs. E.g., ¶¶8, 265.

Those uneconomic trades, as alleged in the CAC and found by the FERC, were entered into with the sole and specific purpose of affecting and moving the monthly index settlement prices of natural gas financial contracts in a pre-determined direction that would benefit TGPNA's derivative financial positions. ¶11. It is well-settled that the type of loss Plaintiffs allege is a loss that "stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co.*, 495 U.S. at 344. *See also Ploss*, 2016 U.S. Dist. LEXIS 82755, at *59 ("The problem with [the defendant's] argument, however, is that it is unlawful manipulation to use its market power … to knowingly affect prices when it had no bona fide, commercial need for the physical wheat and no need to hedge against potential risk."); *Crude Oil*, 913 F. Supp. 2d at 57.

### B.    Plaintiffs adequately allege claims for monopolization and attempted monopolization

#### 1.    Plaintiffs allege a plausible claim for unlawful monopolization

"To state a claim for monopolization under [S]ection 2 of the Sherman Act, Plaintiffs must allege (1) the possession of monopoly power in the relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Crude Oil*, 913 F. Supp. 2d at 51. Plaintiffs have met their pleading burden in the present case.

> ### a.   Plaintiffs adequately plead that Defendant possessed monopoly power

"Ascertaining the existence of market power is 'fact intense' and courts 'reserve dismissal on this issue for pleadings containing only bare and conclusory allegations.'" *Crude Oil*, 913 F. Supp. 2d at 52 (quoting *Parnon Energy Inc.*, 875 F. Supp. 2d at 242); *accord Ploss*, 2016 U.S. Dist. LEXIS 82755 at *77. Plaintiffs may allege monopoly power by pleading either the power to control prices or exclude competition or possession of a predominant share of the relevant market. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). Here, Plaintiffs do both.

Plaintiffs adequately allege monopoly power through detailed allegations showing that TGPNA had the power to, and did in fact, control prices in the physical and financial natural gas market. As explained in the CAC and Section F.B. II, *supra*, TGPNA "monopolized the physical natural gas market" at the Regional Hubs to control prices and the published indices for those hubs by engaging in "excessive trading volumes of uneconomic transactions" and maintaining an "excessively high market share during bidweek" at the Regional Hubs. ¶346; *see also* ¶83 (FERC determined that TGPNA had a "very high market share of fixed price volumes during bidweek"). TGPNA's manipulative conduct ultimately "impacted and controlled the reported monthly index settlement prices." ¶346. By doing so, TGPNA also "directed and controlled prices in the market for natural gas-based derivative contracts." *Id.* TGPNA's uneconomic transactions both increased and decreased Regional Hub index prices in a direction that benefited TGPNA's financial positions. *see* ¶¶191-229; 254-297. These transactions confirm that TGPNA

engaged in unlawful manipulative conduct that "ha[d] the effect of controlling prices." *See PepsiCo*, 315 F.3d at 108; *see also In re Term Cotton Futures Commodities Litig.*, No. 12 Civ. 5126, 2013 WL 9815198, at *24 (S.D.N.Y. Dec. 20, 2013) (finding "market anomalies" caused by defendants' trading reasonably suggested monopoly power); *Crude Oil*, 913 F. Supp. 2d at 53 (finding plaintiff pleaded monopoly power by showing a close correlation between physical and futures price shifts and defendants' manipulative trading).

TGPNA contends that "the [CAC] does not allege facts allowing an inference of market power" because the market share "alleged fall[s] well short of showing monopoly power" and the inference is implausible because the CAC "is devoid of any facts suggesting an ability to control or exclude trading of natural gas." Def. Br. at 30-31. The CAC, however, does allege that TGPNA had the ability to control prices in the market by reason of the excessively large percentage of uneconomic transactions at the Regional Hubs engaged in by TGPNA during the specified bidweeks. During some of the bidweek manipulations, TGPNA participated in 100% of the trading in the Regional Hubs. E.g., ¶205, n.228, *see also* ¶147 (stating that "[t]ransaction data that the CFTC obtained from ICE and [TGPNA] reflected that [TGPNA's] fixed price trades during bidweek often accounted for 50% of the total market by volume during the relevant bidweeks"). Even its Compliance Department and senior management raised concerns with regard to TGPNA's "very high market share of fixed price volumes during bidweek." *Id.* at ¶83. That "excessively high market share," (¶346), of bidweek transactions engaged in by TGPNA also supports Plaintiffs' monopolization claim. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 400-03 (E.D.N.Y. 2008) (holding that evidence of control over prices was sufficient to find monopoly power, but also finding allegations that defendant possessed approximately a 30% market share sufficient to overcome

defendant's assertion that it lacks monopoly power).

### b. Plaintiffs adequately plead that TGPNA intended anti-competitive conduct

Section 2 addresses monopoly power either (1) acquired or maintained through improper means, or (2) if legitimately acquired, exercised with anti-competitive conduct. *Verizon Commc'ns. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). TGPNA claims that the "[CAC] fails to adequately allege exclusionary conduct" because the CAC "provide[s] none of the detail" to describe how TGPNA's transactions were "uneconomic" and does not "identify[] a single communication suggesting [TGPNA] had any anti-competitive intent." Def. Br. at 33.

The CAC describes a willful scheme in which TGPNA acquired a dominant position in physical natural gas at the Regional Hubs during bidweeks solely for the purpose of manipulating the prices of natural gas derivatives. The CAC explains, and indeed the FERC found, that TGPNA's transactions were "largely uneconomic, money-losing trades for physical natural gas" (¶78) because they were entered into without regard to whether they would be profitable or for any legitimate economic purpose, (¶1, n. 1), "far in excess of [TGPNA]'s commercial needs," (¶7), and despite [TGPNA] having "no material customer business, physical assets, or transportation" at the Regional Hubs (¶140). *See also* ¶80 (noting that the FERC determined that Defendant "knowingly or recklessly engaged in a fraudulent scheme to manipulate the monthly index price of natural gas"). It is well-settled that allegations such as these plausibly support an inference of anti-competitive intent. *See New York v. Actavis PLC*, 787 F. 3d 638, 659 (2d Cir. 2015) (finding "willingness to forsake short-term profits to achieve an anticompetitive end" indicative of anti-competitive behavior); *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (defining anti-competitive conduct as "conduct without a

legitimate business purpose that makes sense only because it eliminates competition"); *Meredith Corp. v. SESAC, LLC*, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) (conduct may be characterized as exclusionary if it "does not further competition on the merits or does so in an unnecessarily restrictive way"); *Crude Oil*, 913 F. Supp. 2d at 56 ("the Complaint alleges that [Defendant] acquired its dominant share of physical WTI despite having no commercial need for it, only to sell it at an uneconomic time. This supports an inference of anticompetitive conduct.") (citation omitted).

The inference of intent to engage in anti-competitive conduct is supported in the CAC, which details the testimony of former TGPNA employee and whistleblower, Matthew Wilson. Wilson revealed that TGPNA engaged in numerous uneconomic transactions designed solely to artificially distort the index price in a direction that would benefit TGPNA's derivative financial positions.[9] *See, e.g.*, ¶109 (quoting Wilson as stating that, for the May 2012 bidweek, "I wasn't concerned whether I made or lost money on the fixed price trades. I was concerned with having an impact on the first-of-the-month index."); ¶111 (Wilson testimony as stating that he "purchased fixed price gas at Permian during [the May 2012] bidweek with the intent to

_____

[9] Defendant cites *Shak v. JPMorgan Chase & Co.*, 15 Civ. 992 (PAE), 2016 WL 154119, at *16 (S.D.N.Y. Jan. 12, 2016), as being "on point." Def. Br. at 33. But in that case, the plaintiffs did not adequately plead an anti-competitive scheme or include any statements from employees demonstrating an anti-competitive intent. *See Shak*, 2016 WL 154119, at *16. Here, Plaintiffs include detailed allegations (1) explaining why Defendant's transactions were "uneconomic" (¶¶1 n.1, 7, 140), and (2) from former employee Wilson admitting that transactions in the physical market during bidweek were designed solely to influence the published index price for trading profit in related financial positions (¶¶95-112).

'strengthen' (*i.e.*, raise) the index price at Permian, thereby benefiting [Defendant's] swap position there.").

> **2.      Plaintiffs' Complaint alleges a plausible claim for TGPNA's attempted monopolization.**

TGPNA argues that the attempted monopolization claim "fails for the same reasons" as the monopolization claim. Def. Br. at 34. As discussed above, however, these "reasons" are without merit. TGPNA adds that Plaintiffs did not allege a "dangerous probability that [TGPNA] would achieve monopoly power in the relevant market." Def. Br. at 34. The CAC, however, alleges that TGPNA had the power to, and did in fact, control prices in the physical and financial natural gas market, demonstrating direct evidence of TGPNA's monopoly power. Thus, TGPNA not only attempted to monopolize the market, it succeeded in doing so. *See, e.g.*, *Actavis PLC*, 787 F.3d at 651-59; *In re Zinc Antitrust Litig.*, No. 14 Civ. 3728, 2016 WL 3167192, at *22 (S.D.N.Y. June 6, 2016); *Merced Irrigation Dist.*, 2016 WL 861327, at *11-13 (sustaining plaintiffs' monopolization and attempted monopolization claims based on defendant's voluminous "money-losing trades" made for purpose of impacting daily index price for electricity).

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that Defendant TGPNA's Motion to Dismiss the Consolidated Class Action Complaint be denied.

Dated: July 1, 2016                    **KIRBY McINERNEY LLP**

By: */s/ David E. Kovel*

David E. Kovel
Lauren Wagner Pederson, Of Counsel
Thomas W. Elrod
dkovel@kmllp.com
lpederson@kmllp.com
telrod@kmllp.com

825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

**ROBINS KAPLAN LLP**
Hollis Salzman
Kellie Lerner
Bernard Persky
hsalzman@robinskaplan.com
klerner@robinskaplan.com
bpersky@robinskaplan.com
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499

K. Craig Wildfang
kcwildfang@robinskaplan.com
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181

**CAFFERTY CLOBES MERIWETHER AND
SPRENGEL LLP**
Anthony F. Fata
Jennifer W. Sprengel
Daniel O. Herrera
afata@caffertyclobes.com
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
150 S. Wacker Dr., Suite 3000
Chicago, IL 60606
Telephone: (312) 782-4880
Facsimile: (312) 782-4485

**COHEN MILSTEIN SELLERS & TOLL PLLC**
J. Douglas Richards
Michael Eisenkraft
drichards@cohenmilstein.com
meisenkraft@cohenmilstein.com
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-0177

Facsimile: (212) 838-7745

Times Wang
twang@cohenmilstein.com
1100 New York Ave, Suite 500
Washington, DC 20001
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Interim Co-Lead Counsel*

Steven R. Goldberg, Esq.
225 Liberty Street, Suite 1020A
New York, New York 10281
sgoldberg@srglaw.nyc
Telephone: 212-845-5100
Facsimile: 212-845-4197

*Counsel for Plaintiffs and the Proposed Class*

**RADICE LAW FIRM, PC**
John D. Radice
Kenneth B. Pickle
jradice@radicelawfirm.com
kpickle@radicelawfirm.com
34 Sunset Blvd
Long Beach, NJ 08008
Telephone: (646) 245-8502
Facsimile: (609) 385-0745

**LEVI & KORSINSKY LLP**
Eduard Korsinsky
Lori G. Feldman
Andrea Clisura
ekorsinsky@zlk.com
lfeldman@zlk.com
aclisura@zlk.com
30 Broad Street, 24th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*Counsel for Plaintiff C&C Trading, LLC and the Proposed Class*

37