UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────

ALAN HARRY, LEVANTE CAPITAL, LLC,
PUBLIC UTILITY DISTRICT NO. 1 OF       15-cv-9689 (JGK)
CLARK COUNTY, WASHINGTON (D/B/A
CLARK PUBLIC UTILITIES), and C&C       OPINION AND ORDER
TRADING, LLC, on behalf of
themselves and all others similarly
situated,

                    Plaintiffs,

               - against -

TOTAL GAS & POWER NORTH AMERICA,
INC., TOTAL, S.A., TOTAL GAS & POWER
LIMITED, and JOHN DOES 1-50,

                    Defendants.
────────────────────────────────────

JOHN G. KOELTL, District Judge:

    This is a putative class action under the Commodity

Exchange Act and the Sherman and Clayton Acts alleging

manipulation of prices for physical and financial natural gas

contracts. Alan Harry, Levante Capital, LLC, Public Utilities

District No. 1 of Clark County, Washington (d/b/a Clark Public

Utilities), and C&C Trading, LLC (the "plaintiffs") engaged in

transactions in the physical and financial natural gas markets,

including on the New York Mercantile Exchange ("NYMEX") and the

Intercontinental Exchange ("ICE"). The plaintiffs allege that

Total Gas & Power North America, Inc. ("TGPNA"), Total, S.A.

("Total"), and Total Gas & Power Limited ("TGPL") (the

"defendants") manipulated the price of physical natural gas at

four regional hubs in the southwestern United States between 2009 and 2012. They further allege that such manipulation caused economic harm to the plaintiffs' physical and financial natural gas contracts -- which contracts were tied to natural gas prices at a separate hub, the Henry Hub in Louisiana -- on the theory that manipulation at the regional hubs inevitably impacts prices at the Henry Hub.

All defendants now move to dismiss the consolidated amended complaint ("CAC") for lack of Article III standing and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Total and TGPL ("the foreign defendants") also move to dismiss the CAC under Rule 12(b)(2) for lack of personal jurisdiction. This Court has subject matter jurisdiction pursuant to 7 U.S.C. § 25, 15 U.S.C. § 2, 15 U.S.C. § 15, and 28 U.S.C. §§ 1331 and 1337.

For the reasons explained below, the motions to dismiss for failure to state a claim are **granted.**

**I.**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely

2

to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint should not be dismissed if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 57 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While factual allegations should be construed in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.; see also In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 3d 1, 5-6 (S.D.N.Y. 2016).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 607-08 (S.D.N.Y. 2015).

## II.

The following facts alleged in the CAC are accepted as true for purposes of the defendants' motions to dismiss.

### A.

The North American natural gas market consists of a physical market and a financial market. On the physical market, actual natural gas is produced, stored, bought, sold, and consumed. See CAC ¶ 37. On the financial market, intangible financial products derived from physical natural gas are traded over-the-counter or on public markets. See id. Part of the physical natural gas market consists of "on the spot" sales in which a buyer agrees to pay a negotiated price for natural gas to be delivered by the seller at a specified delivery point the following day. Id. ¶ 43. "Spot" prices reflect daily supply and demand balances and are tied to individual regional hubs -- that is, to the "specific points where pipeline interconnections allow the transfer of gas from one pipeline to another" -- with prices "varying with the demand characteristics of the market, as well as the region's access to different supply basins, pipelines and storage facilities." Id. ¶¶ 3, 39, 44. One of those hubs -- the Henry Hub, located in Louisiana -- "has become the dominant benchmark point in the physical natural gas market because of its strategic location" and the "number of pipeline

connections to the East Coast and Midwest consumption centers" located there. Id. ¶ 40.

Several publications, including Platts Gas Daily ("Platts"), Natural Gas Intelligence ("NGI"), and Natural Gas Week, "survey the market for daily transaction prices" at each delivery hub, which are used to "determine and publish a daily index" made available prior to the next business day. Id. ¶ 44. Physical natural gas transactions call for delivery at a specified delivery hub and are based on either "fixed prices" -- which are negotiated at the time of the transaction -- or "index prices," which are determined each month by trading information reported to Platts and NGI. Id. ¶¶ 5-6. Monthly index prices are based on the volume-weighted average price of all reported fixed price physical natural gas transactions which occur during a monthly settlement period -- the last five business days of each month -- known as "bidweek." Id. ¶ 6. In other words, fixed priced trades made during a bidweek produce the monthly index price at a given hub.

Accordingly, there are monthly index settlement prices for physical natural gas at each delivery hub, including the Henry Hub. Those monthly index prices form the basis of and "are factored directly into the price of natural gas financial products," including, as relevant here, natural gas futures contracts traded on the NYMEX. Id. ¶¶ 6, 49. A futures contract

"is an agreement for the purchase or sale of a particular commodity for delivery on a fixed date in a future month." <u>Id.</u> ¶ 51. A futures contract both "minimizes exposure to price risk by locking in a price to pay, or receive" natural gas delivery, and also enables traders to speculate on natural gas prices. <u>Id.</u> ¶ 52. "The prices of physical and futures natural gas contracts are inextricably linked" such that, as expectations change regarding what the price of natural gas will be at a particular hub on the fixed delivery date, the value of the futures contract for delivery at that hub will likewise change. <u>Id.</u> ¶ 50. Although futures prices can exert influence on physical prices over long horizons, short-term fluctuations in the physical "spot" market at a particular hub can cause futures contracts with upcoming delivery dates to "fluctuate significantly and rapidly." <u>Id.</u>

At the center of this case is a specific kind of natural gas futures contract –- a NYMEX natural gas futures contract. Each such contract is a contract for 10,000 million British thermal units of natural gas to be delivered to the Henry Hub. <u>Id.</u> ¶¶ 3, 57. Prices for NYMEX natural gas futures contracts are "based on physical delivery of natural gas at the Henry Hub," such that the price for natural gas delivered to that hub forms the basis of the "settlement price" of the futures contract. <u>Id.</u> ¶¶ 57-59. "The differential value between [physical] natural gas

6

prices at one delivery hub compared to the natural gas futures prices traded on the [NYMEX] is known as 'basis.'" Id. ¶ 3. In other words, natural gas futures contracts traded on NYMEX derive their prices -- and, accordingly, their value -- from the spot price of natural gas at the Henry Hub, and Henry Hub prices have "become the standard basis reference point" for natural gas prices at other hubs throughout the United States and Canada. Id. ¶ 3; see id. ¶ 39. The vast majority of NYMEX natural gas futures contracts do not result in the delivery of physical natural gas at the Henry Hub; rather, they "are liquidated or cancelled by purchasing or selling a covering futures position prior to the delivery date." Id. ¶ 56.

Henry Hub prices are used as a standardized reference point within the natural gas market because "Henry Hub is the most liquid and active of the physical and futures markets." Id. ¶ 3. Thus, natural gas prices at other regional hubs "are often quoted as a 'differential' between prices at the Henry Hub and [that] regional hub." Id. Physical natural gas at individual regional hubs "may trade either at prices that are higher or lower than Henry Hub, depending on regional market conditions and available transmission capacity between hubs." Id. ¶ 45. Because trading volume at certain regional hubs is so much smaller than at Henry Hub, it is relatively easier to "engage in market manipulation" at those hubs, that is, to influence

7

physical natural gas prices at those hubs. Id. ¶ 42. The CAC alleges that market deregulation and technological innovations have caused regional physical natural gas markets to become co-integrated, such that "price changes in regional hubs impact prices at the Henry Hub." Id.

In addition to futures contracts, there are a number of other financial products linked to natural gas, including options contracts and swap contracts. See CAC ¶¶ 61, 68. Options on futures contracts provide the purchaser with the option (but not the obligation) to "purchase a futures contract for a specified future month at a predetermined strike price." Id. ¶ 61. Swap contracts obligate two parties to "swap" different cash flow streams, each of which is determined by reference to a different price or instrument. See id. ¶¶ 68-71. These and other natural gas derivatives are available to trade on NYMEX and on ICE, which provides an electronic trading platform. See id. ¶¶ 55-71. The CAC alleges that "price changes in regional hubs impact prices at the Henry Hub," and, as a result, affect the price of any financial derivative instrument whose price is tied to the price of natural gas at the Henry Hub. Id. ¶ 42.

**B.**

The Federal Energy Regulatory Commission ("FERC") and Commodity Futures Trading Commission ("CFTC") -- the federal agencies that regulate the natural gas and futures and options

markets, respectively -- began investigations into suspected manipulation by TGPNA of natural gas monthly index settlement prices at four regional delivery hubs in Texas, New Mexico, and California. CAC ¶¶ 72-73. In December 2015, TGPNA entered a $3.6 million settlement with the CFTC ("CFTC Order" or "Order"). See id. ¶ 73; Decl. of Rachel Mondl in Supp. of Mot., Ex. B (CFTC Order). The CFTC Order sets out the regulators' findings, which TGPNA neither admitted nor denied. CFTC Order p. 1. The Order alleges that during bidweeks for September and October 2011, and March and April 2012, TGPNA "attempted to manipulate monthly index settlement prices of natural gas" at four hubs, including El Paso Natural Gas Co., Permian Basin ("Permian"), El Paso San Juan Basin ("San Juan"), Southern California Gas Co. ("SoCal"), and West Texas, Waha ("Waha") (the "relevant hubs" or "regional hubs"). CFTC Order p. 2.

The Order alleges that TGPNA engaged in substantial fixed price trading of physical natural gas during particular bidweeks at the relevant hubs in an attempt to affect the monthly index settlement prices in a way that would benefit TGPNA's related financial or "paper" positions, namely, their positions on certain swap contracts. CFTC Order p. 2. In particular, the Order alleges that TGPNA made trades during the September 2011 bidweek at SoCal and Permian that were meant to manipulate monthly index settlement prices at those hubs to benefit TGPNA's

9

financial position on certain derivatives contracts by
"increasing the spread between the monthly index settlement
prices at SoCal and Permian," that is, by increasing the
difference in prices between the two hubs. CFTC Order pp. 5-6.
The Order alleges that in October 2011, TGPNA made trades at San
Juan intended to manipulate the monthly index settlement price
at that hub in order to benefit TGPNA's short position "by
narrowing the spread between the NYMEX settlement price and the
monthly index price at San Juan." CFTC Order at 6. The Order
also alleges that in March 2012, TGPNA attempted to manipulate
the monthly index settlement price at SoCal in order to benefit
TGPNA's related short position by "narrowing the spread between
the NYMEX settlement price and the monthly index price at
SoCal." CFTC Order at 6. Finally, during the April 2012 bidweek,
TGPNA allegedly attempted to manipulate the monthly index
settlement prices at SoCal and San Juan in order to benefit its
related spread positions at those locations by "increasing the
spread between the monthly index settlement price at SoCal and
San Juan." CFTC Order p. 7. The Order concludes that TGPNA
"specifically intended to execute enough fixed-price trades
during [bidweek] to affect the monthly index settlement prices
of natural gas in the September 2011, October 2011, March 2012,
and April 2012 [bidweeks] at the relevant hubs." CFTC Order p.
8.

The FERC also conducted a lengthy investigation into TGPNA's fixed price trading at the regional hubs, which culminated in April 2016 in an Order to Show Cause and Notice of Proposed Penalty ("Order to Show Cause") and accompanying Enforcement Staff Report and Recommendation ("FERC R&R"). The FERC R&R alleges that TGPNA and two individual employees working at the "West Desk" violated Section 4A of the Natural Gas Act and the FERC anti-manipulation rule, 18 C.F.R. § 1c.1, by devising and engaging in "uneconomic trades of monthly physical fixed price natural gas during bidweek at the [four relevant hubs], and then report[ing] those trades to publications for inclusion in monthly index prices" in order to affect those index prices and "related positions whose value was tied to those same indexes." Mondl Decl. Ex. C (Order to Show Cause) p. 2. As alleged in the FERC R&R:

> This scheme operated in two phases. First, before and during bidweek, the West Desk accumulated large positions of physical and financial natural gas products exposed to monthly index prices [at the relevant hubs], giving it the motivation and ability to manipulate prices. Second, the West Desk traded a dominant market share of monthly physical fixed price natural gas during bidweek [at those hubs] to inflate or suppress the volume-weighted average price and then reported these trades for inclusion in the calculation of the published monthly index prices to which it was exposed.

Mondl Decl. Ex. C, Appendix A (FERC R&R) pp. 1-2. In other words, TGPNA allegedly traded fixed price physical natural gas at the regional hubs in a strategic attempt to affect the

11

monthly index prices at those hubs in ways that would increase the value of its derivative contracts, which were tied at least in part to those index prices. The R&R alleges that such attempted manipulation occurred on at least 38 occasions throughout multiple bidweeks across the four relevant hubs between 2009 and 2012. FERC R&R p. 102.

The Order to Show Cause seeks over $9 million in alleged unjust profits and over $213,000,000 in civil penalties. FERC R&R pp. 2-3, 102; Order to Show Cause p. 1. The FERC proceedings remain pending.

The great bulk of the substantive allegations made in the CAC are lifted directly from those included in the CFTC Order and the FERC R&R. See Mondl Decl. Ex. A (comparing the three documents). But the CAC also includes allegations not made by the CFTC or FERC, including that the defendants' manipulation "was directed [not only] at the relevant hubs, but also at Henry Hub." CAC ¶ 251; see CFTC Order p. 11. The CAC also includes allegations that the plaintiffs maintain are supported by a statistical analysis performed by a "Plaintiffs' Consulting Expert." CAC ¶ 7.[1] The plaintiffs' expert analyzed over 36

---

[1] Although the expert is unnamed in the CAC, in response to the Court's skepticism at the argument of the motions, the plaintiffs subsequently identified the expert as Nejat Seyhun, Ph.D. See ECF No. 102.

million NYMEX natural gas futures transactions and calculated daily average prices for transactions conducted between June 2009 and June 2012. Id. ¶ 255.[2] The expert compared those average prices to spot price data made available by NGI for the Henry Hub, as well as the San Juan, SoCal, and Permian hubs. Id. ¶ 255. The CAC alleges that the pricing patterns identified by the plaintiffs' expert are "consistent with" manipulation that "affected prices for Natural Gas spot and futures prices" beyond those tied to the regional hubs. Id. ¶ 297.

### c.

The plaintiffs seek to represent a class of individuals who, between June 1, 2009 and June 30, 2012 ("the Class Period"), purchased and/or sold physical natural gas contracts or derivative financial natural gas contracts either over-the-counter or on an electronic platform or other exchange at prices "made artificial" by the defendants' alleged manipulation. CAC ¶ 302.[3] The CAC alleges that plaintiff Alan Harry "entered into many hundreds of transactions in natural gas futures and financial contracts throughout the Class Period," including

[2] The plaintiffs attach to the CAC the charts included in the FERC R&R of the actual trades made by TGPNA which are alleged to have been made in an attempt to manipulate prices at those hubs. See CAC Appendix A. According to the FERC R&R, there are 1,182 such trades. FERC R&R p. 95 n.440.

[3] The class definition includes territorial limitations that are not relevant to this decision.

"natural gas futures, options and swaps on NYMEX and ICE" during several bidweeks throughout the Class Period. Id. ¶ 18. Levante Capital is alleged to have made "more than one hundred transactions in natural gas futures and financial contracts during the Class Period," including "more than one hundred transactions in NYMEX and ICE futures, options, spreads and swaps." Id. ¶ 20. Clark Public Utilities allegedly made more than one hundred over-the-counter transactions of "physical and financial natural gas contracts during the Class Period." Id. ¶ 21. Finally, the CAC alleges that plaintiff C&C Trading "made transactions in natural gas financial products on U.S. exchanges," including during at least one of the 38 bidweeks identified in the FERC R&R. Id. ¶ 22. In sum, the CAC alleges that the named plaintiffs collectively traded during "all of the [38] specific bidweeks" identified in the FERC R&R as weeks during which TGPNA attempted to manipulate the price of natural gas at one or more of the four regional hubs. Id. ¶ 23; Order to Show Cause p. 1. The plaintiffs do not allege that during the Class Period they purchased any physical natural gas at one of the four regional hubs or any financial derivative instruments that were tied to index prices at one of those four hubs.

The plaintiffs bring five claims for manipulation and monopolization under the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. ("CEA"), 17 C.F.R. §§ 180.1 and 180.2, and Section 2 of

14

the Sherman Act, 15 U.S.C. § 2. Count One alleges that the defendants "knowingly and recklessly executed physical fixed-price trades during bidweek to influence monthly index settlement prices of natural gas at four major trading hubs," that the scheme influenced natural gas prices more generally, and that such manipulation "caused prices of natural gas and natural gas futures, options, swaps and other derivatives contracts to be artificial during the Class Period." CAC ¶¶ 310, 316. The CAC further alleges that the plaintiffs and members of the proposed class who "purchased or sold natural gas futures, options, swaps and other derivatives contracts," including on NYMEX and ICE, "were injured and suffered damages" as a result of transacting at the allegedly artificial prices. Id. ¶¶ 316, 319, 322. Count One alleges manipulation in violation of Sections 6(c)(3), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9(3), 13(a), and 25(a), and CFTC Rule 180.2, 17 C.F.R. § 180.2.

Count Two alleges that the defendants engaged in unlawful manipulation by distributing to Platts and NGI "false or misleading or inaccurate reports of their uneconomic trades" "knowing, or acting in reckless disregard of the fact that such report[s] [were] false, misleading or inaccurate." Id. ¶ 324. The CAC alleges that the defendants made "untrue or misleading statements of material facts," or omitted "material facts necessary" to ensure that statements were not misleading; in

15

particular, the plaintiffs allege that the defendants failed to disclose that their bidweek trades were made "in order to move natural gas prices uneconomically to benefit their derivative financial natural gas positions." Id. ¶ 328. Count Two alleges manipulation by false reporting and fraud and deceit in violation of Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9(1) and 25, and CFTC Rule 180.1(a), 17 C.F.R. § 180.1(a).

Count Three alleges principal-agent liability under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), on the theory that all three defendants, "through their employees, agents and/or others, directed, developed, executed and otherwise acted with respect [to] the scheme alleged." CAC ¶ 332. Likewise, Count Four alleges aiding and abetting by each defendant as to each other defendant in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

Count Five alleges monopolization and attempted monopolization of "the physical natural gas market at major trading hubs" including the four regional hubs -- Permian, San Juan, SoCal, and Waha -- and the Henry Hub, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. CAC ¶ 344. The CAC alleges that the defendants reported "excessive trading volumes of uneconomic trades and maintained an excessively high market share during bidweek" at the four regional hubs, "which impacted and controlled the reported monthly index settlement prices" at

those hubs. Id. ¶ 346. The CAC further alleges that the plaintiffs -- who traded natural gas derivatives "whose prices were inextricably linked to the price of natural gas" at the four regional hubs -- "were deprived of normal, competitive trading patterns" and suffered financial losses as a consequence. Id. ¶ 351.

The plaintiffs seek treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, as well as punitive and actual damages, costs, and fees.

### III.

### A.

The defendants move to dismiss the CEA claims, Counts One through Four, for failure plausibly to allege damages. "The CEA prohibits any person from 'manipulat[ing] or attempt[ing] to manipulate the price of any commodity.'" In re Commodity Exchange, Inc. Silver Futures and Options Trading Litig. ("Silver Futures") 560 Fed. App'x 84, 86 (2d Cir. 2014) (summary order) (quoting 7 U.S.C. § 13(a)(2)). "While the CEA itself does not define the term, a court will find manipulation where (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." In re Amaranth Natural Gas Commodities Litig., ("Amaranth III") 730 F.3d 170, 173 (2d Cir.

2013) (quotation marks omitted). In order to avoid dismissal, the plaintiffs "not only must allege the elements of a commodities manipulation claim, but also must show that they have standing to sue." In re LIBOR-based Fin. Instruments Antitrust Litig. ("LIBOR I"), 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013). "Under section 22(a) of the CEA, a plaintiff has standing to bring a commodities manipulation action only if he has suffered 'actual damages' as a result of defendant's manipulation." Id. (quoting 7 U.S.C. § 25(a)(1)). "The term 'actual damages' has been applied by courts in a straightforward manner to require a showing of actual injury caused by the violation." Id. (quotation marks omitted).

The CAC does not plead facts that would allow the Court to draw a reasonable inference that the plaintiffs suffered any economic injury as a result of the defendants' alleged manipulation of monthly index prices of physical natural gas at the regional hubs. See Iqbal, 556 U.S. at 678.[4] The plaintiffs'

---

[4] The parties disagree as to "whether the heightened pleading standard of Federal Rule of Civil Procedure 9(b) or the more relaxed standard of Rule 8(a) applies in this case." Myun-Uk Choi v. Tower Rest. Capital LLC, 165 F. Supp. 3d 42, 46 (S.D.N.Y. 2016). "In general, if the theory of manipulation alleged in the complaint is based on false or misleading statements or omissions, it sounds in fraud and Rule 9(b) applies. If, however, the complaint merely alleges a scheme based on a manipulative trading strategy or abuse of market power, courts have found Rule 8(a) more appropriate." Id. at 47 (citations and quotation marks omitted). The CAC alleges an overarching scheme whereby the defendants used a manipulative

theory of damages is as follows: The defendants "manipulated monthly index settlement prices of [physical] natural gas" at the four regional hubs. CAC ¶ 1. According to the allegations in the FERC R&R on which the plaintiffs rely, the defendants engaged in 1,182 trades that are alleged to have been made in an attempt to manipulate index prices at those four hubs. FERC R&R p. 95 n.440. The plaintiffs transacted in instruments priced not with reference to the index prices at those regional hubs, but rather with reference to "NYMEX prices or other instruments tied to the Henry Hub." Plaintiffs' Mem. in Opp. to Mot. p. 14. The CAC further alleges that "pricing relationships between different U.S. physical natural gas hubs are closely and inextricably linked." CAC ¶ 4. Thus, the plaintiffs argue, "short-term spot market dynamics, particularly significant price movements at such regional hubs, will inevitably affect pricing of Henry Hub futures contracts." Id. Next, using a purported

---

trading strategy -- "purchasing and/or selling large volumes of fixed-price natural gas at the relevant hubs" -- in an attempt to "benefit TGPNA's related financial positions." CAC ¶ 73. But the CAC also alleges that the defendants made "false or misleading or inaccurate reports of their uneconomic trades" by failing to report that those transactions were meant to "move natural gas prices uneconomically to benefit [the defendants'] derivative financial natural gas positions." CAC ¶ 328. Which Rule applies makes no difference here, because the 9(b) standard is generally relaxed in market manipulation cases, see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir. 2007), and because the claims are insufficient under either standard.

expert analyzing pricing data from particular regional hubs and
the NYMEX, the plaintiffs allege that manipulation of prices at
the regional hubs had the effect of "artificially influencing
[either] the Henry Hub spot prices or NYMEX natural gas futures"
prices. Id. ¶ 254. Thus, the plaintiffs conclude that the value
of the instruments they purchased was affected by the
defendants' alleged manipulation of physical natural gas index
prices at the regional hubs.

That combination of allegations does not "nudge[] [the
plaintiffs'] claims across the line from conceivable to
plausible." Twombly, 550 U.S. at 570. The CAC is replete with
allegations that the defendants "manipulated monthly index
settlement prices of natural gas" at the four regional hubs. CAC
¶ 1. That is the conduct which formed the basis of
investigations by the FERC and CFTC. But none of the plaintiffs
allege that they purchased any financial instruments -- or any
physical natural gas -- whose prices were based on or directly
tied to monthly index prices at those hubs. See CAC ¶¶ 18-23
(describing the plaintiffs' transactions).

The plaintiffs attempt to make up for the fact that they
did not purchase any financial or physical products tied to
index prices at the regional hubs by alleging that "pricing
relationships between different U.S. physical natural gas hubs
are closely and inextricably linked" such that manipulation of

20

prices at the regional hubs "will inevitably affect pricing" of financial instruments tied to prices at the Henry Hub. CAC ¶ 4. Those allegations do not support a plausible inference that the plaintiffs suffered an actual economic injury as a result of the defendants' alleged manipulation. The plaintiffs have not alleged any facts to support the conclusion that the defendants' manipulation of prices at the four regional hubs had an impact on Henry Hub prices such that the plaintiffs suffered economic losses on the trades they made. The plaintiffs know which trades they made and the FERC R&R identifies the allegedly manipulative trades made by TGPNA at the four regional hubs. Yet the plaintiffs have not attempted to explain how they suffered losses on any of their trades as a result of allegedly manipulative trades made in a market in which they were not participants.

By contrast, the plaintiffs in <u>Alaska Electrical Pension Fund v. Bank of America Corporation</u>, 175 F. Supp. 3d 44 (S.D.N.Y. 2016), alleged that they "transacted in interest rate derivatives expressly tied to" or "directly impacted by" the ISDAfix rate alleged to have been manipulated. 175 F. Supp. 3d at 52 (quotation marks omitted). The plaintiffs there also alleged that "even the smallest movement of ISDAfix," that is, the precise rates alleged to have been manipulated by the defendants, "can drastically affect the value of" the

instruments purchased by the plaintiffs. Id. at 50 (quotation marks omitted).

Similarly, in In re Foreign Exchange Benchmark Rates Antitrust Litigation, ("ForEx II"), 2016 WL 5108131, at *21 (S.D.N.Y. Sept. 20, 2016), the plaintiffs alleged that the defendants had manipulated the foreign exchange ("FX") "spot" market, thereby directly harming the value of the plaintiffs' FX futures and options. 2016 WL 5108131, at *21. The court there concluded that "[b]ecause the [complaint] alleges 'a direct relationship between currency prices in the spot market and the value of each FX futures contract' and that 'futures prices [and options prices] are based on and derived arithmetically from spot prices,' the [complaint] adequately pleads Defendants' ability to influence FX futures and options prices for CEA manipulation purposes." Id.; see also In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig. ("Gold Futures"), --- F. Supp. 3d ---, 2016 WL 5794776, at *3 (S.D.N.Y. 2016) (plaintiffs had standing under the CEA where the "Fix Price" alleged to have been manipulated was alleged to have "a direct impact on pricing throughout the gold market," such that "there was a 99.9% correlation between gold spot prices and futures prices during the Class Period").

No such direct connection has been alleged here because none exists. The monthly index price of physical natural gas at

22

the regional hubs is not incorporated into the price of the derivative instruments purchased by the plaintiffs. There is also no allegation that a price change at one of the four regional hubs would necessarily (or even plausibly) result in a corresponding price change of equal or similar severity at the Henry Hub such that, for example, a five cent drop in prices at Waha or SoCal would result in a five cent drop in prices at the Henry Hub. The CAC does not allege such a relationship, nor could it. Indeed, the plaintiffs disclaimed any such relationship at the argument on the motions to dismiss. ECF No. 104 p. 34. This is because, as the CAC acknowledges, there is no linear relationship between any one of the four regional hubs and the Henry Hub; rather, prices at a regional hub "will trade both above and below the price of Henry Hub throughout the year" depending on "regional market conditions and available transmission capacity between hubs." CAC ¶ 45.

The defendants are alleged to have made 1,182 manipulative trades across four regional hubs over a period of three years. FERC R&R p. 95 n.440. Those trades are alleged to have been made in an attempt to affect index prices at the regional hubs in different directions over different periods of time. See FERC R&R pp. 38-51 (describing examples of attempts to manipulate prices). By comparison, although the plaintiffs do not specify how many physical fixed price trades were made at the Henry Hub

during the Class Period, they do acknowledge that "Henry Hub is the most liquid and active of the physical and futures markets." CAC ¶ 3. The plaintiffs' own submissions also show that there were approximately 36 million NYMEX futures contracts traded during the Class Period. Id. § 255. The plaintiffs do not offer any plausible theory under which the instruments they purchased -- whose prices were based on the price of natural gas at Henry Hub -- could have been affected by those 1,182 trades under these circumstances.

Moreover, the plaintiffs' allegation of damages fails because they "have failed to allege actual losses on any specific transactions." Braman v. The CME Grp., Inc., 149 F. Supp. 3d 874, 892 (N.D. Ill. 2015). The plaintiffs insist that they need not reference specific transactions because, at the pleading stage, injury may be presumed when prices are alleged to have been artificially manipulated. But the cases on which the plaintiffs rely do not suggest that they have sufficiently alleged damages in this case. In each case that the plaintiffs rely upon, the allegations of damages were based on direct manipulation of the price of the instruments that the plaintiffs transacted in, or of the price of the commodity or index underlying those instruments. See Amaranth II, 269 F.R.D. at 373, 380 (injury could be presumed where plaintiffs transacted in NYMEX natural gas futures contracts whose prices were

24

allegedly manipulated by the defendants' trades of such contracts); Alaska Elec., 175 F. Supp. 3d at 53 (plaintiffs "transacted in interest rate derivatives expressly tied to" "or directly impacted by" alleged manipulation of the ISDAfix rate); ForEx II, 2016 WL 5108131, at *21 (plaintiffs purchased FX futures contracts "based on and derived arithmetically from spot prices" alleged to have been manipulated). Moreover, the plaintiffs in Alaska Electrical appended to their complaint a list of nearly 2,000 specific transactions alleged to have been harmed by the defendants' manipulation. See Alaska Elec., 14-cv-7126, ECF No. 164 Ex. 2 (S.D.N.Y. Feb. 12, 2015).[5]

---

[5] The defendants also argue that the plaintiffs lack Article III standing because they have failed to allege an injury in fact. "Article III standing consists of three irreducible elements: (1) injury in fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106-107 (2d Cir. 2008) (quotation marks omitted) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). Injury in fact "is a low threshold" which the Court of Appeals has held "need not be capable of sustaining a valid cause of action." Alaska Elec., 175 F. Supp. 3d at 53 (quoting Ross v. Bank of America, N.A. (USA), 524 F.3d 217, 222 (2d Cir. 2008)). Thus, in some cases, allegations regarding economic injury may require dismissal under Rule 12(b)(6) but nevertheless be adequate to assert Article III standing. See id. But in this case, the plaintiffs have failed even to identify the transactions which allegedly resulted in economic loss. Cf. id. (plaintiffs appended to the complaint a list of every transaction for which they alleged an economic loss). They have not alleged that they "paid more than [they] should have (or [were] paid less than [they] should have

In this case the plaintiffs have access to all the information they need to allege which transactions they engaged in that resulted in economic harm. They have their own trading records, the precise trades that are alleged to have been made in an attempt to manipulate prices at particular regional hubs, and the natural gas futures pricing information over the relevant time period. The plaintiffs' failure to allege a single specific transaction that lost value as a result of the defendants' alleged misconduct precludes a plausible allegation of actual injury. See LIBOR I, 962 F. Supp. 2d at 620-21 (plaintiffs failed plausibly to allege economic injury where they failed to identify specific financial positions that lost value "despite the fact that plaintiffs indisputably have access to their own Eurodollar futures contract trading records"); cf. ForEx II, 2016 WL 5108131, at *20 (concluding that "because Plaintiffs lack information to identify the specific transactions on which they were injured, they need not plead them in order to state a CEA claim"). The failure to include any specific transactions is fatal here because the alleged

---

been) under the terms of a particular transaction" despite having access to the records of all their transactions, and thus have not alleged that the manipulation of prices at the regional hub "plausibly caused each Plaintiff to suffer some loss under the terms of some derivative at some point" during the Class Period. Id. The plaintiffs have therefore also failed to allege an injury in fact sufficient to establish Article III standing to assert violations of the CEA.

manipulation was "varying in direction" compared to prices at
Henry Hub. In re LIBOR-Based Fin. Instruments Antitrust Litig.
("LIBOR II"), 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014).[6] Thus,
"there may be some days when plaintiffs were actually helped,
rather than harmed, by the alleged artificiality, depending on
their position in the market." Id.[7] Thus, if Henry Hub (and thus
NYMEX) prices were allegedly "being manipulated in different

---

[6] At oral argument the plaintiffs argued that the allegations in
the complaint of "persistent manipulation" are similar to the
LIBOR plaintiffs' allegations of "persistent suppression of
LIBOR" for which the court did not require an identification of
specific transactions. LIBOR II, 27 F. Supp. 3d at 460. Although
the CAC alleges multiple instances of manipulation over a period
of several years, the actual instances of manipulation are
alleged to have been episodic, in that they occurred prior to
and during particular bidweeks at particular regional hubs, and
"varying in direction," in that they were allegedly intended to
affect prices in various directions for the benefit of specific
financial instruments that TGPNA held. It is precisely those
sorts of allegations that the court in LIBOR II held must be
accompanied by references to particular trades in order "to
provide details of [the plaintiffs'] own positions in the
market" sufficient to give rise to an inference of economic
injury. Id. at 461.

[7] By contrast, a defendant in In re Natural Gas Commodity Litig.,
("Natural Gas I"), 337 F. Supp. 2d 498 (S.D.N.Y. 2004) was
alleged to have engaged in manipulation of prices at a regional
hub by "churning" in order to increase the price of gas at that
hub. 337 F. Supp. 2d at 521. Moreover, the court there was not
analyzing whether the complaint plausibly alleged damages, but
rather whether the plaintiffs could bring any "churning" claim
at all in light of the fact that the FERC had determined that
such behavior was not unlawful. Id. at 521-22. The court
concluded that dismissing the CEA claim "would effectively
amount to uncritically endorsing the FERC's interpretation of
the statute or giving its proceedings res judicata effect." Id.
at 523.

directions on different days and plaintiffs fail to provide details of their own positions in the market," their alleged damages are "merely 'conceivable' -- and thus insufficiently pled." LIBOR II, 27 F. Supp. 3d at 461 (quoting Twombly, 550 U.S. at 570).

The plaintiffs have therefore failed to allege plausibly that they have suffered "actual damages," and their claims in Counts One and Two of the CAC must be dismissed. LIBOR I, 962 F. Supp. 2d at 620 (quoting 7 U.S.C. § 25(a)(1)).

Moreover, because the plaintiffs failed to state a claim under the CEA in Counts One and Two of the CAC, their claims for aiding and abetting and principal-agent liability, Counts Three and Four, also fail. See 7 U.S.C. § 2(a)(1)(B); In re Platinum and Palladium Commodities Litig., 828 F. Supp. 2d 588, 599 (S.D.N.Y. 2011). In sum, Counts One through Four must be dismissed because the plaintiffs have not plausibly alleged actual damages and thus cannot state a claim for manipulation under the CEA.[8]

---

[8] Although failure to allege damages has been characterized as an issue of statutory standing, "[t]he Supreme Court has recently clarified . . . that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.'" Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352, 359 (2d Cir. 2016) (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1387 (2014)).

**B.**

The CEA claims must also be dismissed because the CAC fails to allege plausibly that TGPNA "specifically intended to cause the artificial price" of physical or financial instruments purchased by the plaintiffs. <u>Amaranth III</u>, 730 F.3d at 173 (quotation marks omitted). "The CEA provides a private right of action against individuals 'who purchased or sold a [futures] contract' if those individuals 'manipulat[ed] the price of any such contract or the price of the commodity underlying such contract.'" <u>Hershey v. Energy Transfer Partners, L.P.</u>, 610 F.3d 239, 246 (5th Cir. 2010) (quoting 7 U.S.C. § 25(a)(1)(D)).[9] Thus, to state a claim under the CEA the plaintiffs must plausibly allege that the defendants specifically intended to manipulate the price of the commodity underlying the contracts they entered into. <u>See</u> <u>Amaranth III</u>, 730 F.3d at 183 ("Plaintiffs-Appellants were required to allege that . . . Amaranth specifically intended to manipulate the price of NYMEX natural gas futures."). The plaintiffs argue that the "commodity underlying" the contracts the plaintiffs purchased is natural gas generally, and that it is therefore unnecessary to allege that the defendants intended to manipulate the price of physical natural gas at the Henry Hub or of derivatives contracts tied to the

---

[9] Both Counts One and Two rely on the private right of action created by 7 U.S.C. § 25(a).

Henry Hub. Plaintiffs' Mem. in Opp. to Mot. p. 21. They contend that allegations of intent to manipulate prices at the four regional hubs is sufficient.

Hershey, which was cited by the Second Circuit Court of Appeals in Amaranth III, is directly on point and disposes of the plaintiffs' argument. In Hershey, as here, the plaintiffs were purchasers of NYMEX natural gas futures contracts. 610 F.3d at 240. The plaintiffs there alleged manipulation of natural gas futures and options prices based on the defendants' alleged manipulation of physical natural gas prices at the Houston Ship Channel hub. Id. at 241. As here, the plaintiffs argued that "prices of physical natural gas, wherever bought or sold, directly affect NYMEX natural gas futures contract prices." Id. at 247. The Fifth Circuit Court of Appeals affirmed dismissal of the complaint and rejected the plaintiffs' argument -- also made here -- that "the interconnected nature of the industry necessitates a finding that natural gas generally is the underlying commodity [of a futures contract] because the fungible commodity at any hub is 'inextricably linked' with the NYMEX natural gas futures price." Id. Instead, the court pointed out that "[u]nder the CEA, actionable manipulation must be directed at 'the price of the commodity underlying such contract.'" Id. (quoting 7 U.S.C. § 25(a)(1)(D)). Thus, the court concluded, the plaintiffs "must allege that Defendants

specifically intended to manipulate the underlying of <u>that</u> contract," in other words, "the spot price at the Henry Hub." <u>Id.</u> A plain reading of the CEA requires the plaintiffs to allege intentional manipulation of the commodity underlying the individual contracts for which the plaintiffs claim damages.[10] The plaintiffs have failed to do so. As the Fifth Circuit Court of Appeals plainly put it: "[I]ntentionality and inevitability are not legally equivalent." <u>Id.</u> at 248.

The CAC does not allege facts that would allow a plausible inference that the defendants acted "with the <u>purpose or conscious object of</u>" manipulating prices at the Henry Hub. <u>Silver Futures</u>, 560 Fed. App'x at 87. The clear purpose of the defendants' allegedly manipulative trading was to affect index prices for physical natural gas at the individual regional hubs in ways "that were intended to benefit TGPNA's related financial positions." CAC ¶ 73.[11]

---

[10] As discussed above, the plaintiffs have failed even to identify those contracts, although it is plain that the plaintiffs have not alleged that they purchased physical natural gas at the four regional hubs or derivatives contracts based on prices at those hubs.

[11] The plaintiffs' reliance on <u>Amaranth</u> is unavailing because "Amaranth's alleged manipulations were directed toward and directly impacted the NYMEX natural gas futures market and the <u>Amaranth</u> plaintiffs alleged that Amaranth specifically intended to manipulate the market of the futures that they had purchased." <u>Hershey</u>, 610 F.3d at 248; <u>see</u> <u>In re Amaranth Natural Gas Commodities Litig.</u>, ("<u>Amaranth I</u>"), 587 F. Supp. 2d 513, 524 (S.D.N.Y. 2008).

The plaintiffs argue, relying on LIBOR II, that they have adequately pleaded intent by alleging that the defendants acted "with reckless disregard for the potential impact of their trading on natural gas prices" generally, such that their "manipulation was not only directed at the [regional] hubs, but also at the Henry Hub." CAC ¶ 251. Those allegations are insufficient and implausible. The court in LIBOR II concluded that the plaintiffs had adequately pleaded scienter through "conscious misbehavior or recklessness" because they had adequately pleaded "that the 'danger' of submitting artificial LIBOR quotes -- the manipulation of the price of Eurodollar futures contracts -- was either known to the defendant banks or so obvious that they must have been aware of it." 27 F. Supp. 3d at 469, 470. In other words, the plaintiffs plausibly alleged that the defendants knew or recklessly disregarded that submitting false LIBOR quotes would result in manipulation of prices of the Eurodollar futures contracts purchased by the plaintiffs, which are priced with reference to LIBOR. Id. at 470. As discussed above, the plaintiffs have not plausibly alleged that such a "danger" existed here -- that is, that manipulative trading on the regional hubs would lead to the manipulation of the price of natural gas futures contracts priced with reference to Henry Hub -- let alone that such a danger was "either known to the [defendants] or so obvious that

they must have been aware of it." Id. Notably, neither the FERC
R&R nor the CFTC Order -- from which the plaintiffs have lifted
their factual allegations nearly verbatim -- include any
allegation that the defendants sought to influence prices at the
Henry Hub, or that the risk of such influence was "so obvious
that they must have been aware of it." Id. Because the
defendants' alleged intent to manipulate index prices at the
regional hubs cannot support a plausible allegation of intent to
manipulate the price of the commodity underlying the instruments
actually purchased by the plaintiffs -- natural gas at the Henry
Hub and derivatives based on that commodity -- Counts One
through Four must be dismissed on this basis as well.

c.

Count Five of the CAC alleges monopolization and attempted
monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2. The
plaintiffs lack antitrust standing, and thus are not the
appropriate parties to bring such a claim.

"To state a claim for monopolization under section 2 of the
Sherman Act, [p]laintiffs must allege '(1) the possession of
monopoly power in the relevant market and (2) the willful
acquisition or maintenance of that power as distinguished from
growth or development as a consequence of a superior product,
business acumen, or historic accident.'" In re Crude Oil
Commodity Futures Litig., 913 F. Supp. 2d 41, 51 (S.D.N.Y. 2012)

33

(quoting PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam)). Because unrestrained private enforcement of the antitrust laws "could be invoked without service to -- and potentially in disservice of -- the purpose of the antitrust laws," a private antitrust plaintiff must also establish antitrust standing. Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 75 (2d Cir. 2013). Antitrust standing is a "threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement" it must be dismissed as a matter of law. In re Aluminum Warehousing Antitrust Litig. ("Aluminum Warehousing"), 833 F.3d 151, 157 (2d Cir. 2016) (quotation marks omitted). "To satisfy the antitrust standing requirement, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations." Id. In order to "avoid a quagmire," the Court "assumes the existence of a violation [of the Sherman Act] in addressing the issue of antitrust standing." Gelboim v. Bank of Am., 823 F.3d 759, 770 (2d Cir. 2016) (alteration and quotation marks omitted).

### 1.

In order to establish the first prong of antitrust standing, antitrust injury, "the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to

prevent and that flows from that which makes defendants' acts
unlawful." Aluminum Warehousing, 833 F.3d at 157 (quotation
marks omitted). The court employs "a three-step process for
determining whether a plaintiff has sufficiently alleged
antitrust injury." Gatt Commc'ns, 711 F.3d at 76. First, the
plaintiff must identify the anticompetitive practice of which it
complains. See id. Next, the Court must "identify the actual
injury the plaintiff alleges." Id. (quotation marks omitted).
Finally, because "[i]t is not enough for the actual injury to be
'causally linked' to the asserted violation," the Court must
"compare the anticompetitive effect of the specific practice at
issue to the actual injury the plaintiff alleges" in order to
determine whether the injury alleged is "of the type the
antitrust laws were intended to prevent and that flows from that
which makes or might make defendants' acts unlawful." Id.
(alterations and quotation marks omitted).

The CAC alleges that the defendants "monopolized the
physical natural gas market" at the relevant regional hubs, as
well as at the Henry Hub. CAC ¶ 344. In particular, the CAC
alleges that the defendants "intentionally reported to index
publishers excessive trading volumes of uneconomic trades and
maintained an excessively high market share during bidweek [at
the regional hubs], which impacted and controlled the reported
monthly index settlement prices" during particular months

between 2009 and 2012. CAC ¶ 346. The CAC further alleges that "[i]n doing so, [the defendants] also directed and controlled prices in the market for natural gas-based derivative contracts, including futures, options, swaps and other derivatives contracts." CAC ¶ 346. In other words, the plaintiffs allege that, by engaging in anticompetitive conduct in the physical natural gas markets at the four regional hubs, the defendants also successfully monopolized the physical market at the Henry Hub and, taking it one step further, the derivatives markets priced with reference to the Henry Hub. For the reasons already discussed, the plaintiffs have failed to allege plausibly an actual injury caused by the defendants' alleged misconduct at

the regional hubs.[12] They therefore cannot establish antitrust standing.[13]

Moreover, the plaintiffs have failed to allege that their purported injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Aluminum Warehousing, 833 F.3d at 157 (quotation marks omitted). "Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury." Id. at 158. "Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."

---

[12] The plaintiffs argue, relying on a recent unpublished decision by the Court of Appeals, Wacker v. JP Morgan Chase & Co., --- Fed. App'x ---, 2017 WL 442366 (2017) (summary order), that their allegations of actual injury are sufficient to survive a motion to dismiss the antitrust claim. See ECF No. 101. But in that case, as in the cases discussed above in Part III.A., supra, the plaintiffs were allegedly injured by the defendants' manipulation of the precise prices that formed the basis of the instruments purchased by the plaintiffs. See Shak v. JPMorgan Chase & Co., 2016 WL 3637105, at *2-3 (S.D.N.Y. 2016), vacated, 2017 WL 442366 (2017) (summary order). Moreover, the plaintiffs there identified the financial instruments that were alleged to have lost value. See id.; Shak, 15-cv-992 (PAE), ECF No. 46 (Jan. 28, 2016) p. 42. The complaint at issue there included "stated dates and transactions," including the estimated number of contracts at issue as well as the plaintiffs' positions in those trades. Wacker, 2017 WL 442366, at *2; Shak, 15-cv-992, ECF No. 46 pp. 42-45.

[13] For the same reasons that the plaintiffs have failed to allege an actual injury, as described in note 5, supra, they have also failed to allege Article III standing to assert their antitrust claim.

Id. (quotation marks omitted). In Aluminum Warehousing, the
Court of Appeals for the Second Circuit recognized that
participants in a market that the defendants used as a
"fulcrum," "conduit," or "market force" to effect the
manipulation of another market may also have antitrust standing
because, under those circumstances, the injury "is inextricably
intertwined with the injury the [defendants] ultimately intended
to inflict." 833 F.3d at 161 (quotation marks omitted).

    The plaintiffs argue that they need not have participated
in the precise market in which the anticompetitive conduct is
alleged to have occurred because courts routinely accept
allegations of antitrust injury "where defendants engaged in a
scheme to manipulate the price of a commodity or commodity index
price with the intent to affect the price of a derivative
financial product tied to that commodity or index price."
Plaintiffs' Mem. in Opp. to Total Mot. p. 29. This assertion is
accurate but ultimately unhelpful to these plaintiffs.

    Courts have accepted allegations of antitrust injury
asserted by plaintiffs who purchased financial instruments where
defendants were alleged to have monopolized the market for the
physical commodity or rate underlying that financial instrument.
In such cases, the plaintiffs' injury can be considered
"inextricably intertwined" with the anticompetitive injury that
the defendant sought to inflict. Gelboim, 823 F.3d at 774

(quotation marks omitted). Thus, in Gelboim, the Court of Appeals concluded that plaintiffs who purchased certain financial instruments could assert antitrust injury where defendants were alleged to have conspired to suppress LIBOR, which determined the rate of return on those instruments. Id. at 764, 773-74; see also, e.g., In re London Silver Fixing, Ltd., Antitrust Litig. ("Silver Fixing"), -- F. Supp. 3d --, 2016 WL 5794777, at *9 (S.D.N.Y. 2016) (investors who sold physical silver or silver derivative instruments had antitrust standing to sue defendants who allegedly manipulated the price of silver); Gold Futures, 2016 WL 5794776, at *10 (sellers of physical gold and gold derivatives stated claim for antitrust injury against banks that allegedly manipulated the price of gold); ForEx II, 2016 WL 5108131, at *6 (plaintiffs who purchased FX futures contracts pleaded antitrust injury against defendants who allegedly manipulated spot prices where the derivative prices moved "in virtual lockstep" with the spot prices). In sum, in such cases -- when plaintiffs allege injury based on a derivative or futures instrument for anticompetitive acts committed in the market underlying that precise instrument -- the markets are "so closely related that the distinction between them is of no consequence to antitrust standing analysis." Sanner v. Bd. of Trade of City of Chicago, 62 F.3d 918, 929 (7th Cir. 1995) (quotation marks omitted). Regardless

of whether the plaintiffs in such cases are considered "participants in the defendants' market" -- defining the "market" to include the derivative market -- or are characterized as alleging an injury that is "inextricably intertwined with the injury sought to be inflicted upon the relevant market or participants therein," the critical fact is that the plaintiffs were participants in the "very market" or markets that were "directly restrained." Aluminum Warehousing, 833 F.3d at 158, 161.

None of these cases help the plaintiffs. The market or markets which were "directly restrained" by the defendants' alleged manipulation are (1) the physical natural gas market at the four relevant regional hubs and, accordingly, (2) the market for derivative financial instruments priced with reference to index prices at those hubs. Id. at 161. The plaintiffs are not participants in either one, and thus cannot establish antitrust injury.

There is also no allegation that the defendants sought to use the manipulation of the natural gas market at the Henry Hub -- or the derivatives market based on the Henry Hub -- as a "conduit" for achieving the manipulation of index prices at the four regional hubs. Aluminum Warehousing is instructive on this point. In that case, the defendants were aluminum derivatives traders and their corresponding aluminum warehouse operator

40

affiliates. 833 F.3d at 155. The defendants were alleged to have
engaged in conduct that increased storage costs at particular
warehouses, which in turn affected the "Midwest Premium" for
physical aluminum, which forms a component of the price for
physical aluminum in the Midwest. Id. at 155-56. The plaintiffs
included, among others, commercial purchasers of aluminum who
manufactured aluminum products ("Commercial Purchasers"), and
consumers of finished products made of aluminum ("Consumers").
Id. at 155. Those plaintiffs argued that the defendants'
manipulation affected the Midwest Premium, which in turn
affected the price that direct purchasers paid for aluminum,
which then affected the cost of downstream purchases made by the
Commercial Purchasers and Consumers. Id. at 156. The plaintiffs
"did not store aluminum in the defendants' warehouses; they did
not trade aluminum futures contracts with the defendants; and
they d[id] not allege that any of the aluminum they purchased
was ever stored in any of the defendants' warehouses, or was the
underlying asset for any of the defendants futures' trades." Id.
at 162. Instead, the Commercial Purchasers and Consumers in
Aluminum Warehousing "premise[d] their claim to antitrust injury
solely on their purchases of aluminum and aluminum products on
the physical aluminum market, where prices were allegedly
affected by the defendants' alleged anticompetitive behavior."
Id.

The Court of Appeals found that the plaintiffs lacked antitrust standing. The Court noted that the plaintiffs had not participated in "any of the markets in which the defendants operate." Id. at 161. The Court found that, because all of the anticompetitive conduct alleged took place in the warehouse storage market, that was the market "where the direct, immediate impact would have been felt." Id. at 162. The Commercial Purchasers and Consumers were not participants in that market, nor were their injuries "a necessary step in effectuating the alleged conspiracy," or "the very means by which the defendants" carried out their illegal scheme. Id. (quotation marks omitted). Thus, the defendants there had not used the plaintiffs as a "fulcrum" or a "conduit." Id. The Court of Appeals concluded that any injury to the Commercial Purchasers and Consumers "was suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme." Id.

So too here. The anticompetitive conduct alleged includes (1) that the defendants made excessive and uneconomic trades and maintained an excessively high market share during certain bidweeks at certain of the regional hubs; and (2) that the defendants intentionally reported those trades to index publishers in order to impact the reported monthly index settlement prices at those hubs. That conduct took place, if at all, in the physical natural gas markets at the regional hubs,

42

and that is where the direct and immediate impact would have
been felt. See Aluminum Warehousing, 833 F.3d at 162. Any impact
on the market for physical natural gas at the Henry Hub or the
related derivatives market at the Henry Hub "was a purely
incidental byproduct of the alleged scheme." Id.; see also In re
Zinc Antitrust Litig., 155 F. Supp. 3d 337, 362-64 (S.D.N.Y.
2016) (concluding that the plaintiffs had not established
antitrust injury where the defendants allegedly conspired to
obtain a monopoly position in one market but the plaintiffs did
not allege any injury "sustained in connection with" the
defendants' position in that market, but rather suffered an
injury in a market the plaintiffs alleged was "inextricably
intertwined" with the monopolized market).

The concept of antitrust injury limits those plaintiffs who
can sue for antitrust damages in order to avoid "duplicative
recovery" and to preclude from suing those with injuries that
are "too remote" from, and not proximately caused by, the
antitrust violation. Aluminum Warehousing, 833 F.3d at 159
(quotation marks omitted). The plaintiffs' position would
undermine those objectives by allowing any participant in the
physical market at the Henry Hub -- and any participant in the
market for derivatives priced with reference to the Henry Hub --
to sue for antitrust violations even though neither of those
markets was the market allegedly directly manipulated by the

43

defendants. Doing so would "limitlessly increase the universe of potential plaintiffs." Id. at 162.

In sum, the plaintiffs were not participants in the "very market that [was] directly restrained" by the misconduct alleged, and have therefore failed to allege plausibly that the injury they suffered is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Id. at 157 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). They thus lack antitrust injury.

### 2.

The plaintiffs are also not efficient enforcers of the antitrust laws. In considering whether a putative antitrust plaintiff is an "efficient enforcer," the Court must consider "(1) the directness or indirectness of the asserted injury, which requires evaluation of the chain of causation linking [the plaintiffs'] asserted injury" to the defendants' alleged manipulation; "(2) the existence of more direct victims of the alleged conspiracy; (3) the extent to which [the plaintiffs'] damages claim is highly speculative; and (4) the importance of avoiding either the risk of duplicative recoveries on the one hand, or the danger of complex apportionment of damages on the other." Gelboim, 823 F.3d at 778 (quotation marks omitted).

Every one of those factors weighs against a finding that the plaintiffs are efficient enforcers. The CAC alleges monopolization of the physical natural gas markets at the four individual regional hubs, which the plaintiffs allege had some impact on the price of physical natural gas at the Henry Hub, which in turn affected the value of the derivative instruments purchased by the plaintiffs. The injuries alleged are thus, as described above, "only indirectly related to the primary violation asserted," and the plaintiffs' alleged damages are "speculative at best." Gatt Commc'ns, 711 F.3d at 78. There exist "more direct victims" of the misconduct alleged, namely, those who purchased physical natural gas at the regional hubs during the time period in which the defendants are alleged to have manipulated the index prices at those hubs, and those who purchased derivative instruments tied to those index prices. Gelboim, 823 F.3d at 778. Finally, were the plaintiffs to seek treble damages in this action, the Court could expect that other participants in the markets in which the plaintiffs participated would do the same for contracts that they speculate may also have been affected by the defendants' alleged manipulation of prices at the relevant regional hubs. See Gatt Commc'ns, 711 F.3d at 78. That pool of potential plaintiffs is vast. In other words, allowing the plaintiffs' monopolization claim would

45

exacerbate the problems that the efficient enforcer concept was meant to resolve.

In sum, because the plaintiffs have failed to establish antitrust injury and have failed to show that they are efficient enforcers of the antitrust laws, they are not entitled to relief under § 2 of the Sherman Act. Count Five must therefore be dismissed.

**D.**

The foreign defendants filed a separate motion to dismiss adopting all of the arguments made by TGPNA. They also argue that the Court does not have personal jurisdiction over them. It is unnecessary to reach the personal jurisdiction arguments because, as described above, the plaintiffs have failed to state a claim under either the CEA or the Sherman Act.

**CONCLUSION**

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the foregoing reasons, the defendants' motions to dismiss, ECF Nos. 64 and 85, are **granted.** The clerk is directed to enter judgment dismissing this action and closing the case. The Clerk is also directed to close all pending motions.

**SO ORDERED.**

**Dated:**    **New York, New York**
             **March 25, 2017**          _____/s/_____

                                              **John G. Koeltl**
                                      **United States District Judge**